[Crim. No. 11317. In Bank. Jan. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GILBERT LEE
DURHAM and EDGAR LEONARD ROBINSON, De-
fendants and Appellants.

Eric A. Rose, under appointment by the Supreme Court, Richard S. Buckley, Public Defender, William V. Larsen, Gerald McC. Franklin and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—A jury found defendants Gilbert Lee Durham and Edgar Leonard Robinson guilty of murder in the first degree. (Pen. Code, §§ 187, 189.) After a penalty trial the same jury fixed the punishment of Durham at life imprisonment and the punishment of Robinson at death, and sentences were rendered accordingly. Durham appeals from the judgment and from the denial of his motion for a new trial.[1] The appeal of Robinson is automatic. (Pen. Code, § 1239, subd. (b).)

On October 16, 1966, about 4 a.m., Los Angeles Police Officers Treutlein and Du Puis, engaged in routine patrol duties, were driving westward on Pico Boulevard in a marked patrol car. They noticed a beige Thunderbird automobile travelling in the same direction in the lane nearest the curb; it bore Ohio license plates and was occupied by two male Negroes. As the Thunderbird proceeded down the boulevard it swerved slightly to the right at two intersecting streets as if making a right turn into them; on each occasion however it continued westbound on Pico. The officers followed the vehicle and at the same time radioed headquarters to ascertain if it had been stolen. Before their radio call was answered, the Thunderbird again made a slight swerving motion to the right

---

[1] The order denying Durham's motion for new trial being nonappealable (Pen. Code, § 1237, subd. 2; People v. Lessard (1962) 58 Cal.2d 447, 450 [25 Cal.Rptr. 78, 375 P.2d 46]), his appeal therefrom must be dismissed.

at an intersection and the officers decided to stop it and question its occupants. They moved into the curb lane behind the Thunderbird, activated their red light, sounded their horn, and directed their spotlight at the rear window. The vehicle stopped near a streetlight, and the patrol car stopped about 6 feet behind it.

Defendant Durham, the driver of the Thunderbird, got out and walked back toward the patrol car but his passenger, defendant Robinson, remained seated in the vehicle. The officers, who were in uniform, unsnapped the retaining straps on their holsters and alighted from the patrol car. Officer Treutlein asked Durham for his driver's license and the latter produced what appeared to be a plastic credit card. Officer Du Puis asked Durham the name of his passenger; Durham in reply gave a short name. Officer Du Puis then went to the passenger side of the Thunderbird and, using the name which Durham had given him, asked Robinson to come to the rear where Durham and Officer Treutlein were standing.

Robinson complied, and Officer Du Puis asked him to raise his hands so as to check him for weapons.[2] Instead, Robinson sprang to a position between the two vehicles and drew a gun from a concealed holster under his shirt. He pointed the weapon at the two officers and ordered them not to move. Officer Du Puis reached for his own revolver and Robinson fired a shot at him, hitting him in the mouth. As he fell Officer Du Puis, who had apparently succeeded in getting his gun free of the holster, fired at Robinson. At this point, Officer Treutlein, who had also drawn his gun, fired at Robinson and hit him. The latter stumbled backward and fell into the street where he lay face up with his gun still in his hand.

Officer Treutlein then directed his attention to Durham, who was crouched on one knee with his hands half raised and his palms spread at about shoulder level. The officer ordered him not to move. Then, keeping Durham covered with the gun, he stepped to the passenger side of the patrol car and reported the shooting on his radio. At one point during the radio call Durham began to lower his hands and Officer Treutlein again commanded him to keep them raised. Durham obeyed. At this point Robinson, who was still in the same position, began to raise his gun toward Officer Treutlein; the

___

[2] At trial Officer Treutlein testified that the area of Los Angeles wherein the events in question took place ''is a very high frequency crime area, and usually, during the hours of darkness, when we have a person that we are talking to, we usually give them a cursory search for weapons.''

latter commanded him to drop it. Robinson did not do so, and the officer thereupon fired a shot which struck the pavement close to Robinson's head. Robinson then dropped the gun.

Officer Treutlein ordered both defendants to lie face down on the pavement. Within a few minutes other officers arrived and took them into custody. A search of Durham produced a knife and sheath from his coat pocket.

Eleven days later, on October 27, 1966, Officer Du Puis died as a proximate result of the gunshot wound inflicted upon him.[3]

Evidence of the foregoing facts, the substantiality of which is not here disputed, was admitted at trial. There was also admitted, over the strenuous objections of defendants, a considerable volume of evidence regarding the joint activities of defendants during some three weeks preceding the incident of October 16, 1966.[4] This evidence showed in substance: (1) that on the day of the homicide both defendants were on parole under felony sentences from the State of Ohio; that defendant Robinson was at that time subject to arrest in Ohio for violation of the terms of his parole; and that the presence of defendants in California under the circumstances obtaining involved several violations of the terms of parole relating to each of them; (2) that on October 5, 1966, eleven days prior to the incident, defendants robbed an A & P store in Toledo, Ohio, of $648; and that in the course of this robbery, Robinson exhibited a pistol similar to that used by him on October 16; (3) that on October 8, 1966, eight days prior to the inci-

---

[3]A great portion of the testimony introduced by the prosecution, and all of the defense testimony, related to the medical treatment received by Officer Du Puis during the period between the date of injury and the date of death. This evidence bore upon the issue whether the gunshot wound was a proximate cause of the officer's death. (See *People* v. *McGee* (1947) 31 Cal.2d 229, 240 [187 P.2d 706].) The jury was fully and fairly instructed on this issue (see CALJIC Nos. 312, 313-A, 331, 331-A, 331-B) and resolved it adversely to defendants. Because no contention on appeal is made relative to the issue of proximate cause, we do not here detail the indicated evidence.

[4]The evidence of defendants' prior joint activities was the subject of a careful pretrial offer of proof by the prosecution, at which time defendants interposed objections and the court heard argument on the admissibility of the evidence. The court's ruling covers some 20 pages of transcript and clearly reflects thorough deliberation on the matter. The court ruled that matters outlined by the prosecutor in his offer of proof could be referred to in his opening statement but that the question of admissibility of any evidence would be determined at the time it was sought to be introduced. It appears, however, that substantially all the matters mentioned in the opening statement pursuant to this ruling were established by competent evidence at the trial (with admonitions and instructions limiting its application where appropriate) in accordance with the reasoning of the court's ruling on the offer of proof.

dent, defendants robbed the Hinky-Dinky Grocery Store in Omaha, Nebraska, of $2,815; that in the course of this robbery Robinson again exhibited a pistol similar to that used by him on October 16; and that he threatened to shoot a cashier in the store if she did not comply with his demands and Durham told the cashier that he (Robinson) "meant it"; (4) that after defendants' departure from the Hinky-Dinky Store the manager ran out to the sidewalk in front of the store after them and, although he saw neither defendant, he noticed a white car parked in an alley across from the store and heard a ·loud report which he assumed to be a backfire; that the rear window of a car then driving past the market was shattered by a bullet and an occupant of the car was injured by flying glass; that the bullet was found under the seat of that car, and a cartridge casing was found near the position of the lone car which the manager had noticed in the alley; and that scientific examination and tests had determined that the cartridge casing found in the Omaha alley was ejected from the · same gun which Robinson used to kill Officer Du Puis; and (5) that the Thunderbird automobile in which defendants were riding on October 16, 1966, had been stolen from a San Francisco automobile agency on or about October 12, and it bore California license plates at that time.

Neither Durham nor Robinson took the stand during the guilt phase or the penalty phase of the trial. We proceed to consider separately the contentions of each defendant on appeal.

*Durham's Appeal*

Defendant Durham advances but two contentions. They reflect a fundamental misunderstanding of the prosecution's theory of the case.

Durham first contends that the evidence is insufficient to sustain his conviction of first degree murder "under either of the two theories of conspiracy and aiding and abetting advanced by the prosecution, thereby denying Durham a fair trial." In support of this point, he argues (1) that the evidence is insufficient to convict him under the prosecution's "conspiracy theory" because any conspiracy to rob had terminated prior to October 16 and there is no substantial evidence to show a conspiracy to resist arrest on or before October 16; and (2) that the evidence is insufficient to convict him under the prosecution's "aiding and abetting theory" because the only evidence introduced in support of this theory is that

indicating that Durham lowered his hands after Officer Treutlein had ordered him to keep them raised after the shooting—and this last item of evidence is not sufficient to support a finding that he aided and abetted in the commission of the crime.[5] Thus would defendant Durham divide and conquer. The difficulty is that the prosecution's theory of the case cannot be split into such fragments.

We observe at the outset that the defendants were not charged with the crime of conspiracy; they were charged with murder. Durham was found guilty of that charged crime as a principal. Our Penal Code provides in relevant part: "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals. . . ." (Pen. Code, § 31.)[6] Since Durham was present at the time of the act constituting the offense, and since he did not directly commit that act, it is clear that he was found guilty as a principal on the theory that he aided and abetted in the commission of the act.

It is true that in presenting its case the prosecution had recourse to the principles of conspiracy. However, this thesis, far from seeking to establish a basis of criminal liability separate and apart from that of aiding and abetting, was pursued for the purpose of demonstrating Durham's intimate involvement in the continuing criminal enterprise which culminated in the shooting of Officer Du Puis.[7]

---

[5]Durham makes no contention that the evidence relating to the defendants' activities prior to October 16, or any part of it, was erroneously admitted against him.

[6]See also Penal Code section 971 which provides in relevant part: ". . . [A]ll persons concerned in the commission of a crime, who by operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals and no other facts need be alleged in any accusatory pleading against any such person than are required in an accusatory pleading against a principal."

[7]Conspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information. In some cases, for example, resort is had to such principles in order to render admissible against one defendant the statements of another defendant. (See, e.g., *People* v. *Teale* (1965) 63 Cal.2d 178, 189 [45 Cal. Rptr. 729, 404 P.2d 209], revd. on other grounds, sub. nom. *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714].) In others evidence of conspiracy is relevant to show identity through the existence of a common plan or design. (See, e.g., *People* v. *Lopez* (1963) 60 Cal.2d 223, 249-250 [32 Cal.Rptr. 424, 384 P.2d 16].) In still others the prosecution properly seeks to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission. (See, e.g.,

In the frequently cited case of *People* v. *Villa* (1957) 156 Cal.App.2d 128 [318 P.2d 828], the court set forth the following principles relevant in the case before us: "To be an abettor the accused must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission.* He must share the criminal intent with which the crime was committed. . . . [W]hile mere presence alone at the scene of the crime is not sufficient to make the accused a participant, and while he is not necessarily guilty if he does not attempt to prevent the crime through fear, such factors may be circumstances that can be considered by the jury with the other evidence in passing on his guilt or innocence. *One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it.* [Citations.] *Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.* [Citations.]" (Italics added.) (156 Cal.App.2d at pp. 133-134; see also 1 Witkin, Cal. Crimes (1963) §§ 44, 45, pp.46-49.)

 In the instant case the prosecution, in support of its sole theory of guilt as to Durham, sought to show that he "instigated or advised the commission of the crime" in that he was a party to a compact of criminal conduct which included within its scope the forcible resistance of arrest *and that he was also*[8] "present for the purposes of assisting in its commission" in that his conduct at the scene of the incident, viewed in its totality, was wholly consistent with such purposes. The jury determined that the evidence produced supported the prosecution theory and accordingly found Durham guilty. The evidence supports the finding.

---

*People* v. *Teale, supra,* 63 Cal.2d 178, 187-189; *People* v. *Pike* (1962) 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Lapierre* (1928) 205 Cal. 470 [271 P. 500]; *People* v. *Kauffman* (1907) 152 Cal. 331, 334-337 [92 P. 361].) The instant case falls in the last category. (See generally, Comment (1952) 26 So.Cal.L.Rev. 64.)

[8] As was pointed out in *Villa,* "[o]ne may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it." (156 Cal.App.2d at p. 134.) Of course, one may also be a principal to crime without being physically present at the time of actual commission. (See Pen. Code, § 31.)

In the early case of *People* v. *Kauffman* (1907) 152 Cal. 331 [92 P. 361], we considered a contention identical to that at bar. There defendant and five other men devised a plan to burglarize the safe at a cemetery. They provided themselves with burglars' tools and each, with the exception of defendant, armed himself with a pistol. When they arrived at the cemetery, however, they found an armed guard and decided to return to the city. They rode as far as possible on a streetcar and then began to walk toward the downtown area, where they had their rooms. In the course of the walk two of their number became involved with police in a manner which does not appear from the opinion; in any event, a gun battle ensued in which a police officer was killed. Defendant, found guilty of second degree murder after a trial wherein the foregoing facts were presented in detail, urged that the evidence did not support the judgment because there was no showing that he had taken any active part in the actual killing, and, on the contrary, it had been shown that at the time of the shooting he had been standing still with his hands in the air.

This court, in rejecting this contention, held that the evidence was sufficient to support a finding that defendant was a member of a "combination or conspiracy"[9] whose purposes included that of common resistance to arrest and detection while going to and coming from the scene of the proposed burglary—and that the evidence was therefore sufficient to support the judgment against defendant as an aider and abettor. In the course of our discussion we considered the very contention which defendant Durham here advances: "The contention of the appellant is that the unlawful combination or conspiracy embraced only the proposed burglary at the cemetery, and that when this project was abandoned by reason of the discovery of an armed guard on the premises, the conspiracy or common design was at an end, and that anything done thereafter was the individual act of the party doing it. If, as a matter of law, it can be said that the criminal combination embraced no more than this contemplated burglary, and that the shooting of [the policeman] was not within the reasonable and probable consequences of the common unlawful design, it would follow that no case was made out against the appellant. But whether or not the act

---

[9] Again we emphasize that the resort to language of conspiracy in cases such as that under consideration does not refer to the crime of that name but only to the fact of combination as it has relevance to the question of aiding and abetting in the commission of the charged crime.

committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury, [citations], and if there be any evidence[10] to support the finding of the jury on this question, its determination is conclusive." (152 Cal. at p. 335.) We went on to hold that the evidence was sufficient to support the jury's finding, observing that "pistols are used by burglars not for breaking into safes but for preventing interference with the criminal design or arrest by those who may discover its existence." (152 Cal. at p. 337.)

In *People* v. *Wheaton* (1923) 64 Cal.App. 58 [220 P. 451], the facts were even more closely parallel to those of the instant case. There five men determined to undertake a series of burglaries. All were armed except defendant Wheaton. After an unsuccessful attempt to break into one store and a discussion concerning the burglary of another, they noticed that their automobile was being followed by police. The officers stopped defendants' car and engaged in a short discussion, whereupon one of the officers entered the back seat of defendants' car and told them to drive to the police station. After they had driven a short way, a scuffle broke out in the back seat and the officer was killed by gunfire. Defendant Wheaton, who had been in the front seat and had not fired any shot, was nevertheless convicted of first degree murder. In response to his contention that the evidence was insufficient to support the judgment the court said: "The evidence in the case . . . establishes beyond controversy that the five defendants, on the night of the shooting, were jointly engaged in an expedition of crime. . . . Wheaton, while not as active as the others, was fully aware of their intentions and the purposes of their trip. . . . His presence with the other defendants on the night of December 6th can only be accounted for upon the theory that he was one of them and stood ready to participate in any crime which they might decide to undertake. The evidence shows that on the night of December 6th there was a thorough understanding among the five men to commit the crime of robbery or burglary, or both of such crimes, and if

---

[10]The rule requiring that a finding of fact be supported by "substantial" evidence, explicated in *Estate of Bristol* (1943) 23 Cal.2d 221, 223-224 [143 P.2d 689], was not expressly announced until 1919. (*People* v. *Tom Woo* (1919) 181 Cal. 315, 326 [184 P. 389].) We consider that the principles set forth in *Kauffman*, which was decided 12 years earlier, are presently qualified by the rule of "substantial" evidence.

detected by the officers to resist arrest, even at the risk of taking the lives of those who should attempt to arrest them. Under such a state of facts, all who participated in any such understanding or conspiracy are equally guilty of any crime which is the natural and probable consequence of such an enterprise, whether he personally commits the act or whether its commission is done by any one of his associates in carrying out the common purpose. [Citations.]'' (64 Cal.App. at pp. 66-68.) Observing that the facts in the case before it were ''much stronger'' than those of *Kauffman*, the court concluded that the evidence was sufficient to sustain the judgment against Wheaton.

Again, in *People* v. *Lapierre* (1928) 205 Cal. 470 [271 P. 500], defendant had been engaged with her husband and brother in an extensive series of burglaries. When police officers went to their house to make an arrest for these crimes, defendant allowed them to enter, but her husband and brother, who were concealed in the kitchen, then became engaged in a gun battle with the officers and one of the officers was killed. This court, sustaining defendant's subsequent conviction of manslaughter against a contention of insufficient evidence, observed that the evidence warranted a finding that defendant, her husband, and her brother, ''were coconspirators in an agreement or combination to rob victims, and burglarize buildings and places of business and to commit forgeries, even contemplating the resistance of attempts on the part of police officers to apprehend and arrest all or any of them, to the extent of taking human life if necessary. Not only this, but appellant under the evidence actually aided and abetted her said husband at the very time of the shooting, and she could well have been convicted of murder instead of manslaughter.'' (205 Cal. at p. 471.)[11]

---

[11]The *Lapierre* case is also notable for the reason that it recognizes the function of conspiracy principles within a theory of guilt based on aiding and abetting. In response to defendant's contention that she could not be guilty of the crime of conspiracy with her husband, we noted inter alia that ''this is not a prosecution for conspiracy, the existence of the conspiracy showing only that appellant aided and abetted the commission of the crime.'' (205 Cal. at p. 471.) (See also *People* v. *Fleming* (1961) 191 Cal.App.2d 163, 168 [12 Cal.Rptr. 530], and *People* v. *Talbott* (1944) 65 Cal.App.2d 654 [151 P.2d 317].) In *Talbott* where the defendant, convicted on several substantive counts of grand theft, raised the question on appeal as to whether he had been convicted as a principal or as a coconspirator, the court said: ''A defendant in a criminal action therefore is convicted as a principal or accessory or not at all; and in this connection, the fact that principals may be conspirators is immaterial.'' (65 Cal.App.2d at pp. 660-661.) '' 'All persons concerned in the commission of a crime . . . are principals' and, when

■ In view of the evidence in the instant case which we have outlined above the jury could reasonably have found that defendants for some time prior to October 16, 1966, had been engaged in a joint expedition which involved the commission of robberies as they moved westward across the country and which included among its purposes the forcible resistance to arrest; that Durham was fully aware of the fact that Robinson both had exhibited his pistol in the commission of said robberies and had actually fired it at one who had sought to apprehend them in the act of escaping; that at the very time they were stopped by Officers Treutlein and Du Puis, defendants were further engaged in the commission of a crime, namely, the driving of an automobile stolen by them (Veh. Code, § 10851); that Durham knew that Robinson was armed when they emerged from the car; and that in the totality of circumstances Robinson's act was, and was known by Durham to be, a reasonable and probable consequence of the continuing course of action undertaken by the defendants.[12] The finding of such facts would be sufficient to support the finding of Durham's guilt as an aider and abettor under the principles we have above set forth. Since the jury was adquately instructed in the premises, we must conclude that the indicated findings were made—and that the evidence is therefore sufficient to support the verdict as to Durham.

■ What we have said above renders unnecessary a consideration of Durham's second and final contention, to wit, that the trial court erred when it refused to instruct the jury that before it could convict him of murder, it must agree unanimously on one or both of the "two theories" of guilt

---

two or more are 'concerned,' they are bound by the acts and declarations of each other, when such acts and declarations are part of the 'transaction' in which they are engaged, because they are 'principals' and not because they are conspirators. . . . The liability of a defendant for a criminal act is fixed by the provisions of section 31 of the Penal Code defining principals; and no instruction on the subject of conspiracy can add anything to that liability. . . . Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal.'' (65 Cal. App.2d at pp. 664-665.)

[12]The case of *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222], is clearly distinguishable. There, although we refused to make an express ruling on the point, we intimated that the evidence tying defendants who had not directly committed the murder to the crimes out of which such murder arose was ''thin'' and based on ''mere association and opportunity to conspire.'' (63 Cal.2d at p. 792.) The situation here is clearly otherwise.

upon which Durham was allegedly prosecuted.[13] As we have shown, the prosecution proceeded on a single unified theory of guilt as to Durham, that he aided and abetted in the murder of Officer Du Puis.

### Robinson's Appeal

Defendant Robinson raises two contentions relating to the whole of the trial; he raises five contentions relating only to the penalty phase of the trial.

### A. Contentions Relating to Both Phases of the Trial

Robinson first urges that it was error to admit over his objection evidence of the parole status and joint criminal activities of defendants during the approximately three weeks preceding the incident which resulted in the death of Officer Du Puis. (See fn. 4, *ante,* and accompanying text.) This contention relates to both phases of the trial; during the penalty phase the jury was properly instructed that in its determination as to penalty it should consider all evidence received "throughout the trial before this jury." (CALJIC No 306.1 (New).)

We first consider the contention in question as it relates to the guilt phase of the trial. The relevant principles were fully stated by us in the recent cases of *People* v. *Kelley* (1967) 66 Cal.2d 232, 238-239 [57 Cal.Rptr. 363, 424 P.2d 947], and *People* v. *Haston* (1968) 69 Cal.2d 233, 244-245 [70 Cal. Rptr. 419, 444 P.2d 91]. As we there indicated in greater detail, evidence of other crimes is inadmissible as regards guilt when it is offered solely to prove criminal disposition because the probative value of such evidence as to the crime charged is outweighed by its prejudicial effect. However, such evidence may be properly admissible if it is offered to prove a fact material to the charged crime and meets the general tests of relevancy as to such fact. "[T]he general test of admissibility of evidence in a criminal case is whether it tends logically, naturally. and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People* v. *Kelley, supra,* 66 Cal.2d 232, 239, paraphrasing *People* v. *Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924].) Such evidence should be scrutinized with great care, however, in light of its inherently prejudicial effect, and

---

[13]In making this contention defendant Durham requests that we reconsider and overrule our decisions in *People* v. *Chavez* (1951) 37 Cal.2d 656 [234 P.2d 632], and *People* v. *Nye* (1965) 63 Cal.2d 166 [45 Cal.Rptr. 328, 403 P.2d 736].

should be received only when its connection with the charged crime is clearly perceived.

As we have indicated above (see fn. 4, *ante*), the evidence here in question was admitted against Robinson at the guilt phase of the trial only upon careful and thorough consideration by the court. It was concluded by the court that the evidence was relevant and material on the issues of premeditation, motive and intent;[14] the jury was so instructed in the terms of CALJIC No. 33.

Defendant Robinson contends that the evidence of his participation in the other crimes and acts in question was not sufficient to warrant consideration of such evidence by the jury. Suffice it to say that our examination of the record convinces us that there was ample evidence in the record upon the basis of which the jury could reasonably find that Robinson had participated in such acts and crimes.[15]

Defendant Robinson also contends that the evidence in question should not have been received because its probative value was slight in comparison to its prejudicial effect. In making this contention he overlooks the great probative value

---

[14]The jury was also instructed that the evidence might be considered on the question whether ''the defendants were members of a conspiracy to commit criminal offenses at the time of the homicide which contemplated resistance in case of attempts on the part of police officers to apprehend any or all of them, to the extent of taking human life if necessary.'' Whereas the matter of ''conspiracy'' was relevant as to defendant Durham on the issue of aiding and abetting the commission of the crime, it was relevant as to defendant Robinson, who was alleged to have ''directly commit[ted] the act constituting the offense'' (Pen. Code, § 31), on the issues of intent, premeditation, and motive. (See fn. 7, *ante*.)

[15]In this regard we note that the jury was instructed at the conclusion of the guilt phase as follows: ''I instruct you that the evidence that the defendants were on parole and that the defendants committed crimes other than the one of which they are accused and for which they are on trial may not be considered for any purpose unless proved beyond a reasonable doubt.'' This instruction, although requested by the prosecution, imposes a more stringent standard of proof than the law requires in the premises. Although a person charged with crime cannot be convicted thereof unless he is proved guilty beyond a reasonable doubt, other uncharged offenses introduced to show the existence of some element of the charged crime need only be proved by a preponderance of substantial evidence. (See *People* v. *Lisenba* (1939) 14 Cal.2d 403, 429-432 [94 P.2d 569]; *People* v. *Albertson* (1944) 23 Cal.2d 550, 579-580 [145 P.2d 7]; *People* v. *Haston, supra,* 69 Cal.2d 233, 253-254; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 273 [70 Cal.Rptr. 438, 444 P.2d 110].) The situation is otherwise when such offenses are sought to be utilized on penalty issues; there the jury may not consider such offenses unless it is convinced beyond a reasonable doubt that defendant committed them. (*People* v. *Polk* (1965) 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Varnum* (1967) 66 Cal.2d 808, 815 [59 Cal. Rptr. 108, 427 P.2d 772].)

of the evidence throwing light upon his state of mind at the moment of confrontation. There is ample authority for the admission of evidence of prior criminal activity when such evidence provides considerable circumstantial proof of the actor's mental state at the time of the charged offense.

The early case of *People* v. *Woods* (1905) 147 Cal. 265, [81 P. 652, 109 Am.St.Rep. 151], involved the prosecution of the person who had directly committed the homicide which we have described above in our summary of *People* v. *Kauffman, supra,* 152 Cal. 331. (See pp. 182-183, *ante.*) There defendant Woods contended that evidence relating to the plan to rob the cemetery should not have been admitted against him because it had no bearing upon the actual confrontation which resulted in the death of the police officer. We rejected that contention, observing that the evidence bore directly upon the mental state of the malefactors at the moment of the killing. "Apart from all other evidence except that going to show that the parties met and fought and that one was wounded and the other killed, a jury might not be warranted in finding that the survivor [defendant] was not acting in self-defense. But when they are informed that the slayer was one of a party of burglars returning from an unsuccessful attempt, in preparation for which they had armed themselves with loaded pistols and provided dynamite and burglars' tools, then in their possession, that the person killed was a police officer attracted to the spot by a loud outcry followed by the discharge of a pistol by one of the party, they would be warranted in concluding that the officer did nothing more than his duty under the circumstances, because he had no motive to do more, and that the parties who had armed themselves for just such a contingency, and who had the strong motive to prevent the discovery of the burglars' tools in their possession, that they, or some of them, would put their pistols to the use for which they were provided, and that they deliberately murdered the officer to escape detection." (147 Cal. at p. 271.)

The case of *People* v. *Bringhurst* (1923) 192 Cal. 748 [221 P. 897], involved the prosecution of the person who had directly committed the homicide which we have described above in our summary of *People* v. *Wheaton, supra,* 64 Cal.App. 58. (See pp. 183-184, *ante.*) There defendant Bringhurst contended that the court erred when it admitted over objection evidence of a robbery committed by the same parties three days prior to the criminal expedition which resulted in the death of the officer. We rejected the contention. "Without discussing any other points raised by the contention, the testi-

mony was 'admissible as tending to show a motive on the part of the defendants for the homicide of the two policemen. It explained why the defendants were so anxious to prevent arrest . . . knowing that they were all guilty of the crime of robbery, it is easy to understand why they might take life before they would suffer themselves to be arrested, their crime found out, and the severe punishment meted out to them which the law affixes to the crime of robbery. [Citations.]' '' (192 Cal. at p. 752.) (See also *People* v. *Pool* (1865) 27 Cal. 572; *People* v. *Lapierre* (1928) 205 Cal. 462, 468-469 [271 P. 497]; *People* v. *La Vers* (1933) 130 Cal.App. 708, 713 [20 P.2d 967].)

The case of *People* v. *Robillard* (1960) 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], although it did not involve multiple defendants, clearly demonstrates the probative value of prior specific acts and offenses in regard to the mental state of the actor at the time of the charged offense. There defendant, who was on probation for prior offenses and had committed other recent offenses for which he had not been apprehended, was driving a stolen car with stolen license plates. A police officer, suspecting that the car had been stolen, stopped defendant and radioed to headquarters in order to check on the car. Before the answer arrived over the radio the officer was shot to death by defendant, who used for the purpose a pistol which he had hidden on his person. At the trial defendant objected to the admission of all evidence of his prior offenses and the fact of his probation. On appeal we held that the evidence was properly admitted. ''This evidence was relevant to establish defendant's motive for the killing, the prosecution's case being based on the theory that defendant had premeditatedly killed Officer Doran in order to avoid apprehension for such crimes.'' (55 Cal.2d at p. 100.) (See also *People* v. *Combes* (1961) 56 Cal.2d 135, 146-148 [14 Cal.Rptr. 4, 363 P.2d 4].)

 We hold that evidence of defendant Robinson's parole status and his criminal activities in conjunction with Durham was of ample probative value to outweigh its prejudicial effect, and that it was properly admitted at the guilt phase of the trial.

Robinson additionally argues that the jury was improperly allowed to consider the evidence in question at the penalty phase of the trial. As we have pointed out (see fn. 15, *ante*) uncharged offenses must be proved beyond a reasonable doubt before the jury may consider them in its deliberations

.as to penalty. ▊ The jury was so instructed in this case. Again we say without a detailed summary of the evidence that it was sufficient to permit its consideration by the jury.[16]

Defendant Robinson's second general contention relating to both phases of the trial is that he was denied his constitutional right to the assistance of counsel. Again, this contention is made in two parts.

It is first contended that his constitutional right to counsel was infringed when the court denied his pretrial motion to relieve retained counsel and to appoint other counsel or allow him to proceed in propria persona. In connection with this contention it appears that the indictment was returned on November 3, 1966; that Robinson was represented by the public defender at arraignment and thereafter obtained continuances as to plea in order that he might retain private counsel; that on November 23, 1966, the public defender was relieved as counsel and Robert Fitzpatrick, Esq. was substituted; that Mr. Fitzpatrick represented Robinson on the entry of his plea and on various pretrial motions; that on February 27, 1967, when the cause was called for trial, Mr. Fitzpatrick moved in .Robinson's behalf that he (Fitzpatrick) be relieved as counsel of record and that new counsel be appointed or Robinson be · permitted to proceed in propria persona; that the sole reason . given for said requests was that Robinson and his retained counsel were in disagreement as to how the defense should be conducted in certain undisclosed particulars; and that all of said motions were denied after the court had consulted relevant authorities and had made the additional determination that Robinson was not competent to defend himself against a charge of murder in which a request for the death penalty was contemplated.

The sole authority cited by Robinson in support of his claim that the·denial of these motions infringed his constitutional rights is *People* v. *Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868]. That case, however, as well as . the recent case of *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65], involved a defendant who,

---

[16]Robinson appears to argue that we should consider the evidence as to each uncharged offense with a view to determining whether, as a ·matter of law, it was proved beyond a reasonable doubt. This suggestion reveals a misunderstanding as to the scope of our review upon appeal. .Although the penalty jury is to be instructed that it must find the ·uncharged offenses·beyond a reasonable doubt (see fn. 15, *ante*), our · function on appeal begins and ends with the determination as to whether substantial evidence was presented from which the jury could reasonably have found that defendant had committed the uncharged offenses.

having settled upon arrangements for the conduct of his defense by a particular attorney, was confronted with an order of the trial court requiring that he alter those arrangements and proceed with the representation of a different attorney. We held in such circumstances that "the state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources—and that that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People* v. *Crovedi, supra,* 65 Cal.2d 199, 208.)

 The instant case, in contrast to *Crovedi* and *Smith*, involves a defendant who, having retained a particular attorney for the conduct of his defense (which attorney has pursuant to said retainer prepared a defense and made various pretrial motion), seeks to discharge said attorney on the first day of trial on the ground that he, the defendant, is in disagreement with the attorney as to the conduct of the defense. In order to grant the request the trial court was faced with two alternatives: either to grant a continuance so that a new attorney could prepare for trial,[17] or to allow defendant to proceed in propria persona. The first alternative was unsatisfactory because it clearly would have resulted in "a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (65 Cal.2d at p. 208.) The second was equally unsatisfactory because, as the trial court determined after conducting an inquiry as to the defendant's capability to defend himself, allowing him to proceed in propria persona would have "result[ed] in significant prejudice to the defendant himself." (65 Cal.2d at p. 208.) The motions were properly denied.

 Robinson's second argument urging denial of his right to counsel is grounded in the fact that his attorney called no witnesses in his behalf at the penalty phase of the trial.[18] It is urged that this failure reduced that phase of the

---

[17]It is doubtful that defendant would have been entitled to *appointed* counsel in view of the fact that he had already succeeded in *retaining* one attorney. Therefore, the contemplated continuance would have had to allow time for defendant to secure other private counsel.

[18]Robinson concedes that counsel conducted a spirited and able defense at the guilt phase of the trial. The jury was properly instructed that in the course of its deliberations as to penalty it was to consider "all of the evidence received here in court presented by the people and defendants throughout the trial before this jury." (CALJIC No. 306.1 (New).)

trial to a "farce or a sham" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]), and thus denied him the effective aid of counsel. It is suggested that there must have been *some* available evidence in mitigation of penalty which might have been produced in his behalf, and that the failure to produce *any* such evidence resulted in constitutional infirmity.

We do not accept this suggestion. ▮ Allegations of representation so inadequate as to amount to constitutional defect must be supported by more than speculative arguments. (Cf. *Adams* v. *United States* ex rel. *McCann* (1942) 317 U.S. 269, 281 [87 L.Ed. 268, 63 S.Ct. 236, 143 A.L.R. 435].) ▮ Defendant has pointed to no specific evidence in mitigation which might have been presented in his behalf; he has named no witnesses who, if called in his behalf, would have testified favorably to him on penalty issues. On the other hand, it appears that counsel presented to the penalty jury a well-reasoned argument in defendant's behalf which emphasized the momentary nature of the confrontation resulting in Officer Du Puis' death, reminded the jury that Robinson had suffered only one previous conviction six years prior to the incident, and generally appealed to the mercy of the jury in a persuasive manner. It further appears from the record that counsel intended to place defendant himself upon the stand during the penalty phase in order to testify concerning an earlier offense of sodomy upon which the prosecution had offered evidence at that phase—and that he finally decided against doing so after a careful consideration as to the scope of cross-examination which such testimony might warrant. Finally, counsel subjected each witness presented by the prosecution at the penalty phase to cross-examination. In view of the totality of circumstances we cannot conclude that the representation afforded defendant at the penalty phase herein resulted in a denial of his right to the effective aid of counsel in that proceeding.

B. *Contentions Relating Only to the Penalty Phase of the Trial*

Robinson first contends that error occurred in the admission into evidence of certain testimony concerning a prior offense of sodomy committed by him in Ohio six years previous to the charged homicide. It is urged that the court erroneously refused to weigh the probative value of such testimony against its prejudicial effect prior to allowing its admission. It is further argued that the probative value of such testimony

was in fact outweighed by its prejudicial effect, that it was introduced "primarily to inflame the passions of the jurors" (*People* v. *Love* (1960) 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705]), and that it should have been excluded.

It appears that the Ohio sodomy conviction to which the challenged testimony related was charged against Robinson as a prior conviction in the amended indictment; that the record of said conviction was before the court in connection with a pretrial motion to strike the prior; and that upon denial of that motion the prior was admitted by Robinson. It further appears that when the prosecution at the penalty phase commenced to offer testimony relating to the facts of the offense, defendant objected on the grounds that the record of conviction was available to the court and could be placed before the jury, that the offense had occurred at a time remote from that of the charged offense, and that the probative value of testimony outlining the facts of the offense was slight in comparison to its great prejudicial and inflammatory effect. The objection was overruled by the court in the following language: "Well, the jury is charged with the responsibility of making a determination as to the type of punishment to be imposed and receive no assistance from the court or counsel. It is in their sole discretion. That is the reason why evidence of complete background, history, and all the facts in aggravation and mitigation are properly to be considered by the jury. So, the objection is overruled."

The testimony in question was given by the girl who had been the victim of the Ohio sodomy offense six years prior to the homicide. The girl was 13 years old at the time of trial; she had been seven at the time of the offense.[19] She testified in general that on a date in 1960 defendant Robinson came to her house (where he was a frequent visitor because he was related through adoption to the girl's mother) when she was alone there with her two younger sisters, and that he then and there required her to perform an act of fellatio with him; it was also at least implied that defendant required one of the girl's younger sisters to submit to sexual abuse. The testimony described the act in vivid detail and even included a description of the taste of semen which entered her mouth.

In the case of *People* v. *Love, supra,* 53 Cal.2d 843, we discussed the rule governing admission of allegedly inflammatory evidence at the trial on the issue of penalty. There the

[19]Apparently the girl was brought from Ohio with her mother for the purpose of giving evidence on the 1960 offense.

trial court admitted over the defendant's objection a photograph of the victim showing her facial expression in death and a tape recording of a conversation which the victim had with a member of the prosecutor's office shortly before her death. We there observed that the recorded conversation dealt with the basic facts of the shooting, which had been established at the trial on the issue of guilt, and that ''The sole purpose of playing the recording, therefore, was to let the jury hear the failing voice and the groans of the deceased as she was dying.'' (53 Cal.2d at pp. 854-855.) We then proceeded to set forth the following principles: ''Allegedly inflammatory evidence is admissible only when its probative value outweighs its prejudicial effect. [Citations.] Since the jury has complete discretion to choose between the alternative penalties in the light of the objectives of criminal law (Pen. Code, §§ 190, 190.1; see Michael & Wechsler, Criminal Law and Its Administration 6-17), the permissible range of inquiry on the issue of penalty is necessarily broad. [Citations.] The determination of penalty, however, like the determination of guilt, must be a rational decision. Evidence that serves primarily to inflame the passions of the jurors must therefore be excluded, and to insure that it is, the probative value and the inflammatory effect of proffered evidence must be carefully weighed. [Paragraph.] The remoteness in time of the events being proved, the availability of less inflammatory methods of imparting to the jury the same or substantially the same information, and the bearing of the evidence on the several objectives of punishment are among the many factors to be considered. [Citations.] '' (53 Cal.2d at p. 856.)

Applying these principles to the facts of the *Love* case, we observed that the evidence in question had no significant probative value because the basic facts of the shooting had been established at the guilt phase, and the pain experienced by the victim, even if considered relevant, had been more than adequately described in medical testimony before the jury. We concluded that ''Both the photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded.'' (53 Cal.2d at p. 857.) Moving to the question of prejudice, we noted that the inflammatory effect of the erroneous admission was aggravated by the prosecutor's argument to the jury which made multiple references to the subject evidence. Concluding that the presence of such inflammatory evidence and argument before the penalty

jury rendered impossible a reasonably accurate assessment of how the jury would have reacted to mitigating factors in its absence, we held that a new hearing on the issue of penalty was required. (See also, *People* v. *Hines* (1964) 61 Cal.2d 164, 173-174 [37 Cal.Rptr. 622, 290 P.2d 398] ; *People* v. *Terry* (1964) 61 Cal.2d 137, 145, fn. 5 [37 Cal.Rptr. 605, 390 P.2d 381].)

However, in *People* v. *Bentley* (1962) 58 Cal.2d 458 [24 Cal.Rptr. 685, 374 P.2d 645], and *People* v. *Talbot* (1966) 64 Cal.2d 691 [51 Cal.Rptr. 417, 414 P.2d 633], we upheld the admission at the penalty phase of certain allegedly inflammatory evidence. In *Bentley* the evidence in question related to crimes committed in Arizona subsequent to the murder of which defendant had been found guilty, and it showed that at the time of those later crimes defendant "displayed a complete indifference to human life. . . ." (58 Cal.2d at p. 460.) Although there was ample other evidence in the record of defendant's repeated criminal behavior, we held that the questioned evidence was admissible because "The jury was entitled to know that he was not revulsed by that killing [of which he had been found guilty] but was willing to kill again." (58 Cal.2d at p. 461.) We distinguished *Love* in the following terms : " [T]he People did not present inflammatory evidence of facts that were already in evidence and that were of doubtful relevance at best, but only eyewitness testimony necessary to establish what Bentley said and did in the course of the Arizona crimes." (58 Cal.2d at p. 461.)[20]

In *Talbot* the trial court without objection at the penalty phase, received in evidence certain photographs of the deceased. It was contended for the first time on appeal that such photographs should have been excluded under the *Love* rationale. We rejected the contention, noting the absence of a proper objection and observing that the photographs "were not illustrative merely of pain" but "were used in connection with the autopsy surgeon's testimony and helped clarify for the jury just what happened to the deceased." (64 Cal.2d at p. 708.)

In the instant case it is clear that defendant raised a timely and proper objection to the admission of the specific evidence in question on the ground that its probative value was outweighed by its prejudicial effect. Moreover, it would

---

[20]Our opinion in *Bentley* does not reveal whether defendant objected to the admission of the subject evidence at trial on the ground that its probative value was outweighed by its prejudicial effect.

appear that defendant, by making this objection, did not intend to withhold from the jury information relative to the prior sodomy conviction but rather sought to explore with the court "the availability of less inflammatory methods of imparting to the jury the same or substantially the same information" (*People* v. *Love, supra,* 53 Cal.2d 843, 856), for he at that time made express reference to the fact that the certified record of conviction was available to the court and could be submitted to the jury. Although we must agree with the Attorney General that the simple submission to the jury of the record of conviction would not have conveyed to the jury all relevant aspects of the offense,[21] we cannot ignore the consideration that a preliminary examination of the subject evidence by the court might well have resulted in the presentation of all relevant information to the jury in a manner less inflammatory than that here utilized. The court's peremptory refusal to conduct such a preliminary examination operated in this case to eliminate this alternative.

Although we do not approve of the court's refusal, upon proper objection, to examine and evaluate the proffered evidence in light of the standard enunciated in *Love,* it is clear that that refusal did not constitute error if the probative value of the evidence *in fact* outweighed its prejudicial effect and rendered its admission proper. We need not dwell upon the prejudicial effect of the evidence and its tendency to appeal to the jury's sense of passion and outrage. On the other hand, it does appear that the evidence was of substantial *probative* benefit to the prosecution, for it showed the precise act which was the subject of the prior conviction (see fn. 22, *ante*) and conveyed to the jury an idea of the manner in which it was performed. Further, the probative value of such evidence was not of a purely cumulative nature, as was the case in *Love,* for there was in the record no other evidence dealing with the prior sodomy conviction. Finally, it is notable that here, as in *People* v. *Bentley, supra,* 58 Cal.2d 458, the evidence in question related not to "the circumstances surrounding the [charged] crime" but rather to "defend-

[21]The record of conviction apparently denominated the crime simply as "sodomy" and did not further identify the act within the various categories of acts which society has historically condemned as sodomitical. Webster's Third New International Dictionary (1961) defines "sodomy" as follows: "carnal copulation with a member of the same sex or with an animal or unnatural carnal copulation with a member of the opposite sex; *specif*: the pentration of the male organ into the mouth or anus of another—compare BESTIALITY, BUGGERY, CUNNILINGUS, FELLATIO, HOMOSEXUALITY, PEDERASTY."

ant's background and history." (See Pen. Code, § 190.1.) The prejudicial impact of evidence dealing with the latter subject matter must be considered less pervasive than that of evidence dealing with the former subject matter—as did the evidence in *Love* itself. In view of all of these considerations we have concluded that the probative value of the evidence was sufficient to outweigh its clear prejudicial effect, and that therefore the court did not err in admitting it.[22]

Robinson next contends that CALJIC No. 306.1 (New),[23] which was given to the jury herein on request of the prosecutor, is inconsistent with the legislative mandate of section 190.1 of the Penal Code in that that instruction informs the jury that the question of penalty lies within their "absolute discretion," whereas the statute requires that that question lies within the "discretion" of the trier of fact. It is argued that the "discretion" referred to in section 190.1 is rational discretion of the sort generally referred to as "legal discretion" (see *Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424), whereas the "absolute discretion" referred to in the instruction is subject to whim and caprice. We do not believe, however, that the use of the term "absolute discretion" in the challenged instruction can be construed to convey to the jury the meaning which defendant would attach to it. This is especially so when, as in the instant case, the penalty jury is instructed in the terms of CALJIC No. 11 (New) that the authority vested in it "is not an arbitrary power, but must be exercised with sincere judgment, sound discretion, and in ac-

---

[22]At oral argument defendant suggested for the first time that he was surprised by the testimony of the girl and should have been allowed time to produce defensive evidence on the matter. It appears, however, that defendant requested no continuance on the ground of surprise; therefore, he may not raise the issue at this time.

[23]CALJIC No. 306.1 (New) provides in relevant part: ". . . It is the law of this state that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life, at the *discretion* of the jury. If you should fix the penalty as confinement for life, you will so indicate in your verdict. If you should fix the penalty as death, you will so indicate in your verdict. Notwithstanding facts, if any, proved in mitigation or aggravation, in determining which punishment shall be inflicted, you are entirely free to act according to your own judgment, conscience and *absolute discretion*. That verdict must express the individual opinion of each juror. [Paragraph.] Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and *absolute discretion* of the jury. In the determination of that matter, if the jury does agree, it must be unanimous as to which of the two penalties is imposed." (Italics added.)

cordance with the rules of law stated to you.'' Further we do not believe that the indicated portion of CALJIC No. 11 (New) can reasonably be considered to conflict with CALJIC No. 306.1 (New).

 Robinson contends that the trial court's modification of a certain portion of CALJIC No. 11 (New) was erroneous. The portion in question informs the jury that it is not ''to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.'' The instruction given, as modified by the court, informed the jury simply that it was not to be governed by public opinion or public feeling. The modification was properly made pursuant to our opinion in *People* v. *Polk* (1965) *63 Cal.2d 443*, at p. 451 [47 Cal. Rptr. 1, 406 P.2d 641].

Robinson contends that sections 190 and 190.1 of the Penal Code are unconstitutional insofar as they permit the imposition of a sentence of death. This contention has been adequately treated by this court in *In re Anderson* and *Saterfield,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117].

 Finally Robinson contends that the court acted in violation of *Witherspoon* v. *Illinois* (1968) *391 U.S. 510* [20 L.Ed.2d 776, 784, 88 S.Ct. 1770], when it excused for cause certain jurors expressing a conscientious objection to the death penalty. The *Witherspoon* case makes it clear, however, that constitutional guarantees are not violated when the court excuses for cause ''those who [have] made unmistakably clear . . .' that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, . . .'' (391 U.S. at p. 522, fn. 21 [20 L.Ed. 2d at p. 785].) We have examined the *voir dire* examination of each of the three jurors excused for cause in the instant case and have concluded that the indicated standard was here met. We set forth in the Appendix relevant portions of the *voir dire* examination upon which the claim of *Witherspoon* violation is based.

Defendant Durham's attempted appeal from the order denying his motion for a new trial is dismissed. The judgments are affirmed. ·

Traynor, C. J., McComb, J., Peters, J., Mosk, J., and Burke, J., concurred.

### Appendix

''The Court: Having in mind all of those questions do you know of

any reason why you could not serve as a fair and impartial juror in this case, should you be selected?

"MRS. RODGERS: Yes, I do.

"THE COURT: Yes?

"MRS. RODGERS: I don't believe in capital punishment.

"THE COURT: When you say you don't believe in capital punishment——

"MRS. RODGERS: I mean I don't go along with it, let's put it that way.

"THE COURT: In answering the way you have, is it your statement that irrespective of the facts in the case, under no circumstances, should a verdict of guilty of murder in the first degree be arrived at by the jury, could you ever impose the death penalty?

"MRS. RODGERS: No, sir.

"THE COURT: You never could under any circumstances ever impose the death penalty?

"MRS. RODGERS: No, sir.

" . . . . . . . . . . .

"THE COURT: Is there anything that has been suggested in any of the questions that you feel we should have the benefit of with reference to your serving as a fair and impartial juror in this case?

"MR. RIOS: Yes, sir.

"THE COURT: What is that, please?

"MR. RIOS: I do not favor the death penalty, sir.

"THE COURT: When you say you do not favor the death penalty, let me make this inquiry of you: Assuming that you heard the facts in this case and that the jury returned a verdict of guilty of murder in the first degree, then you were charged with the responsibility after the conclusion of the penalty phase of the case to determine whether the punishment of death or life imprisonment be imposed, it is your position that under no circumstances, irrespective of what the facts of the case would be, that under no circumstances could you or would you impose the penalty of death.

"MR. RIOS: I don't believe so.

"THE COURT: You would not under any circumstances?

"MR. RIOS: Under any circumstances.

"THE COURT: Irrespective of what the facts of the case might be?

"MR. RIOS: Yes.

" . . . . . . . . . . .

"THE COURT: Mrs. Levin, having listened attentively to all of the questions that have been proposed to all of the prospective jurors, was anything suggested in those questions that you feel you would like to mention to us before questions by counsel?

"MRS. LEVIN: Yes. I'm afraid my feeling about the death penalty is prejudiced.

"THE COURT: When you say you feel your feeling about the death penalty would prejudice you, would you be a little more specific? Do you have some opinions or rules with reference to the imposition of the death penalty?

"MRS. LEVIN: Yes.

"THE COURT: And is your position such that should a verdict of guilty of murder in the first degree be arrived at by the jury, that under no circumstances could you conscientiously impose the death penalty?

"MRS. LEVIN: I'm afraid so.

"THE COURT: I'm sorry.

"MRS. LEVIN: I'm afraid I could not impose the death penalty.

"THE COURT: You say that you are afraid you could not impose the death penalty. Assume that—let me ask you this question: Is it your position that irrespective of the facts that are developed in the case that,

in the penalty phase of the case, that under no circumstances would you ever impose the death penalty, is that your position?
"MRS. LEVIN: Yes.
"THE COURT: Irrespective of the facts in the case?
"MRS. LEVIN: Yes."

TOBRINER, J.—I concur in the affirmance of the judgments as to guilt for the reasons stated in Justice Sullivan's opinion. I concur in the affirmance of the judgment imposing the death penalty on Robinson under compulsion of the majority's holding in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], with respect to the constitutionality of the death penalty.

Peters, J., concurred.

The petition of appellant Robinson for a rehearing was denied February 19, 1969.