Filed 9/5/23  P. v. Carpio CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESSIE FRANK CARPIO,<br><br>Defendant and Appellant. | F083148<br><br>(Super. Ct. No. F16903501)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  David Andrew Gottlieb, Judge.

Law Office of Roger Nuttall and Roger T. Nuttall; Page Law Firm and Edgar E. Page for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jessie Frank Carpio was charged with nine counts of committing a lewd act upon Jane Doe, a child under 14 years of age (Pen. Code,[1] § 288, subd. (a) [counts 1-9]). Following trial, the jury found him guilty as to counts 1 through 8 and not guilty as to count 9. The trial court imposed an aggregate determinate sentence of 20 years: six years (the middle term) on count 1 and two years (one-third the middle term) on each of counts 2 through 8.[2]

On appeal, defendant makes several contentions. First, the trial court erroneously denied a motion to substitute counsel. Second, the court erroneously denied a new trial motion. Third, defense counsel rendered ineffective assistance of counsel by failing to object to various purported acts of prosecutorial misconduct. Finally, the cumulative effect of the aforementioned errors deprived defendant of due process and a fair trial. For the reasons set forth below, we reject these arguments and affirm the judgment.

## STATEMENT OF FACTS

### I. Prosecution's case-in-chief

a. *Testimony of Officer Jacobo*

Sometime after midnight on June 1, 2016, Officer Jacobo of the Fresno Police Department was dispatched to "the location of a runaway juvenile." Upon her arrival, she encountered Jane, who was "with her mother . . . and her aunt" and "was on and off crying." Jacobo took Jane aside for an interview. Jane eventually calmed down and asked for her aunt to be with her. When Jane was asked "why she didn't want to go home," she said, "[S]he was not treated right at home" by "[h]er stepfather and her mother." When Jane was asked where she was living in the meantime, she revealed "her stepfather had got her [a] hotel room." Jane identified defendant as her stepfather. She

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] The record contains a July 30, 2021 minute order that erroneously identifies a two-month sentence as to count 2.

told Jacobo "it was time for the truth to come out," she and defendant "had been having sexual intercourse since she was 11 or 12," and defendant "would purchase her cellphones, clothes, purses, gifts like that to not say anything."

Jane detailed the following incidents:

When Jane "was about 11 or 12," "she walked into" "her mother and [defendant]'s bedroom and saw [defendant] watching pornography on the computer." He "asked her if she wanted to feel the way the people in the video were feeling." Even though Jane "said no," defendant "took his clothes off, laid on the bed and asked her to rub his penis." Jane did so "[f]or a couple minutes . . . ." "[F]or several months" thereafter, "[w]hen [Jane's] mom wasn't home," defendant "would make [Jane] rub his penis with her hands."

"[A] couple months after" Jane touched defendant's penis for the first time, defendant began "put[ting] his fingers in her vagina." He did this more than once and usually "in [Jane's] mom's room when she wasn't home."

"[A] couple months after [defendant] started rubbing [Jane's] vagina," he sent her the following text message: "I want that booty." Defendant subsequently "picked [Jane] up" and "went to a[n unknown] residence." There, he "took his clothes off" and "laid on the bed." Jane "got on top of him" and he "inserted the head of his penis into her vagina . . . ." She "said it hurt," "got off," and "put her clothes back on." Overall, Jane and defendant engaged in vaginal intercourse "several times . . . ."

On one occasion, Jane and defendant were in the latter's truck when he "made her orally copulate him" for "[a]bout 10 to 15 minutes." Although Jane said, "[S]he didn't like that," defendant "would still push her head further down onto his penis."

Sometime before June 1, 2016, after Jane ran away from home, defendant "purchased [a hotel] room for her to stay in." "[H]e met her there" and "told her to get in the shower with him." Jane, who "was on her menstrual cycle," "said she didn't want to but [defendant] forced her." "[W]hile in the shower, he stood behind her[,] . . . she put

3.

her leg up on one of the handrails[,] and he put his penis into her vagina and had sexual intercourse with her until he ejaculated at the bottom of the shower tub."

One month before the "hotel incident," Jane and defendant were at home when "he put his penis all the way inside her buttocks and . . . ejaculated . . . ."

At some point during the interview, defendant arrived on the scene. Jane, who did not want to see him, felt nauseated. She hid behind a nearby vehicle, "g[ot] down in a fetal position" (boldface omitted), and cried.

b. *Testimony of Jane Doe*

At the time of trial, Jane was 19 years old. She testified she was "around 11 to 12" years old when she entered defendant's bedroom and saw him "watching porn" on the computer. Defendant told Jane to "come here and watch." He then "sat [her] on his lap" and "caressed [her] legs." Jane could not recall if defendant forced her to touch his penis during this initial incident, but she remembered he made her do so on other occasions. He would also touch her vagina "at the house" "when [her] mom was mostly gone." Jane had "forced" vaginal and anal sexual intercourse with defendant multiple times between the ages of 11 and 13. She also performed oral sex at least twice: once in defendant's truck and another time in the garage of his "mechanical shop" where he "told [her] to just act like it was [her] boyfriend." Generally, after each incident, defendant would buy Jane things—e.g., "a piece of clothing or a phone"—in return for her silence.

Sometime before June 1, 2016, Jane ran away from home. Defendant contacted her and offered to book a hotel room for her, insisting he "wanted to help" and "didn't want [her] to be on the streets and stuff." Jane "was scared that when he got the room he was going to do more stuff," but she relented because she had nowhere else to go. On the night Jane stayed in the hotel room, defendant visited "three or four" times. The two had sexual intercourse in the shower because Jane was "on [her] menstrual" and "mildly bleeding." Afterward, she "wash[ed] [her] inside" and "scrubb[ed] down there because it felt nasty."

4.

Jane left the hotel because "[her] mom had found out that [she] was there." Eventually, Jane's mother tracked her down and asked "if the defendant had did anything . . . ." Jane "told her yes." Jane's mother "threw [a] big ole fit" and asserted she was "going to do this," "going to do that," and "all this." Ultimately, however, Jane's mother "still stood by [defendant's] side."

c. *Testimony of David Love*

Love—a licensed marriage and family therapist, founder of a local nonprofit organization servicing victims of child abuse, and a consultant in the field of child abuse treatment—testified "[i]t's unusual to have a child molested by a stranger." Typically, child abuse occurs in places children "should be safe" such as the home, church, school, or camp.

According to Love, "the most typical reactions of children who have been molested" can be sorted into five categories: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed disclosure; and (5) retraction, which arises only "[i]n a limited number of cases . . . ." These categories are collectively known as child sexual abuse accommodation syndrome.

Regarding the category of secrecy, Love explained:

"We have a problem that we don't do a very good job with sex education in this culture. We don't talk about sexuality in most homes and places in schools. We don't do any really effective and in-depth education about what I call good touch bad touch programs, which we have had a limited number of. If someone says this to you, or touches or asks you to do this, immediately come to your teacher, your mother or somebody else. That's not comprehensive and we have to remember that. So children don't have a framework to tell about something they often never even thought about having [*sic*] to themselves and obviously a little depends on the age of the child, but even knowing if it's wrong, never going to happen to me. Couldn't even conceive that. The other next piece of it, so important, when a child comes into therapy . . . , children feel responsible for what's taken place. [¶] . . . [¶]

5.

". . . They blame themselves. We call it stigma. Now part of it is because they might have been told that nobody is ever going to believe you and so that's already kind of a message that is there with them in this dynamic. But also children should not be doing sexual things. They know that. Now they did it. Children often don't even have good vocabulary to talk about sexuality. If you use a sex word, often as a child it's four letters and you get punished for it. And even to describe good anatomy and sexuality depending on the age of the child, it's difficult for a lot of them, confusing for a lot of them in some way or another, so they often feel that part of it was their fault. They will be looked at as being bad or dirty or something like that."

When asked how "the fact that a perpetrator may be a family member come[s] in to play" (boldface omitted), Love answered:

"We are told in our culture to obey your elders, do what important people say in your life, be good, and this is an important person, either by statement or by indication. And the fact that most children are molested by people that have a previous existing relationship with them, this is not stranger danger, even though I see it on TV sadly. So if it's your stepdad or your brother or your priest or your rabbi or your school teacher or your coach, those people you should respect, other people respect, they are there to instruct you, tell you what to do, you should follow their direction. And therefore getting this out – children can't even believe anybody would even believe them if I said that about this person because they are a[n] important person and people like them and people respect them."

When asked about "the influence that maybe a caretaker would have over a child with respect to the secrecy element" (boldface omitted), Love replied:

"Well, the more vulnerable a child is, the more needy a child is, the more the child is dependent on others makes them somewhat an easier target. And anything good or positive that they get, even though it's mixed with some pretty yucky – I like kids' words, yucky stuff – maybe I just have to put up with this stuff for other things, whether it's food, shelter, care or safety, those kind of things."

When asked about "situations where maybe the child victim is uncomfortable talking to one parent to accuse the other parent" (boldface omitted), Love remarked:

"That's got to be a horrible double bind. I can't say it any other way. Because I see this relationship between parents, caretakers, whether it's step or bio parents is something they value, it's important. A is not

6.

going to side with me against the other parent.  Why would they believe this 'cuz this is the person that they trust their love with or they are with or they spend time with.  It's just a horrific obstacle and that's why it falls under the secrecy level."

Regarding the category of helplessness, Love testified:

"First of all, we've got to understand we're talking about children.  They are not mini adults, so they don't have the sophistication of an adult.  They don't have the experience of an adult.  They don't see the world with the context of adult experience.  They don't understand the molest or sexual interactions to put in context the inappropriateness of this activity.  So they are really left without skill sets, knowledge, the ability to be able to extract themselves from the situation in some form or another, so they are left in a pretty helpless scenario."

Regarding the category of entrapment and accommodation, Love explained:

"So now we take the helplessness and now we look at the situation as a whole.  They are trapped.  They can't find a way out of there because of the power of the person molesting them, the dynamics of the situation of the molest, their sophistication and ability to find other options, children without a lot of resources, so they are trapped in this dynamic which is not comfortable and they don't like but don't know how to get out of it.  And so why this is two part then what will happen under a high number of situations with kids is they will have coping mechanisms or find a way to get by in spite of all this terrible stuff that they are having to experience."

When asked "why would a child rape victim return to their abuser" (boldface omitted),

Love responded:

"You have to remember there's a pre-existing relationship with that person, so they may still care about them or find them important in their life.  They are very ambivalent because on one hand this is a person that's been important or maybe even has been a positive relationship for a period of time, but they really hate what's now being done to them, so they are stuck in this really horrible bind with these two sides of the coin.  And kids are amazing and want to fix stuff.  So, in other words, well, maybe if I was just better – because they feel like they're bad, remember, so maybe if I was just better, this person would stop doing this.  Maybe if I treated them nicer, they wouldn't do these things to me.  Maybe if I was better – if it happened to be parent relationship or stepparent relationship, maybe if I was better and they didn't have problems, so they are really in a save or fix,

7.

make it okay, and they want to believe it will be okay again, so you pretend it's okay."

When asked whether a return would occur "even if the child maybe feared imminent harm" (boldface omitted), Love answered:

"Children have – all of us have one of three responses when we're threatened. You can flee, you can fight back, or you start freezing up where you become immobilized and don't make good decisions and can't function. So we know that with children, the freezing phenomenon, kind of not functioning well is much more common.

"Actually, Dr. Hooper at Harvard said we look at kids and we're confused because here's a person molesting them and they are still polite when they are around them. They treat them nice. They're actually hoping it will get better soon. And he came up with a psychological term we use a lot now. It's called the fear habit paradox. So you're afraid, and under this fear and freezing, you'll actually revert back to the way you used to treat that person before they did these bad things. And it's just you don't have any other response pattern than the one that you have done for a long time with that person prior to the molest beginning."

Finally, regarding the category of delayed disclosure, Love testified:

"One of the important things about delay is that most kids haven't told anybody after a year. Actually, Dr. John Brar at the University of Southern California looked at over 250 kids looking at [Dr. Roland] Summit's work and said let me go back and look at another group of molested kids and he said many haven't disclosed after five years. And then when we wrote our book and we interviewed 40 people who had been molested in the Stockton area, particular interested in people who delayed a long time, and it was between 10 and 20 years for the people that we included in our work and our book before they had told a single human being. So it's important to understand it's not unusual to delay. In fact, it's more common than not to delay and there are lots of really powerful reasons why people just don't come forward. [¶] . . . [¶]

". . . [S]ometimes they basically start putting all this pain back and a lot of the memory of it they cover over to emotionally and psychiatrically protect themselves in some form or another. Depending on the age of the child, for many years they are not old enough, sophisticated enough, feel powerful enough to even tell anybody. And my adults felt so embarrassed about it and all those issues, even at that point they didn't come forward. My book dealt with like 20 priest molest cases so they are a little unique,

8.

but nobody would believe them and they didn't want to say bad things about their priest. Kids don't want to say bad things about a parent or caretaker in some form or another, so they just keep putting it off and putting it off and putting it off and that really adds to the length of time from event to even maybe having stopped to disclosure."

## II. Defense's case-in-chief

### a. *Testimony of Beatrice R.*

Beatrice first met defendant in 2009. Since then, he has been "[her] boyfriend." Beatrice was aware Jane's mother was "the mother of [defendant's] children" and Jane was his stepdaughter. She was "not too sure" if defendant was "seeing [her and Jane's mother] both at the same time" but "kn[e]w that [Jane's mother] was always in the picture . . . ."

When Beatrice found out about Jane's accusations against defendant, she "was shocked." She spoke to her own daughter, who had been alone with defendant in the past, "for peace of mind." Beatrice pointed out defendant has remained in contact with her daughter and her daughter was "not uncomfortable with it . . . ." She added the alleged acts of sexual misconduct were inconsistent with defendant's character.

On cross-examination, when as asked if she "ever suspected that the defendant . . . was secretly seeing [Jane's mother] behind [her] back" (boldface omitted), Beatrice answered: "I did a few times." On those occasions, she confronted defendant.

### b. *Testimony of defendant*

Defendant met Jane's mother in or around 2004, when Jane was approximately 18 months old. Defendant and Jane's mother "started out as friends" but became more intimate "a few months in." They have five biological children together.

While defendant and Jane's mother lived together, they watched pornography in their bedroom on the latter's desktop computer. They did so with the door locked and out of the children's sight. Because Jane's mother set a password, defendant—who did not know said password—could not use the computer unless she was present.

9.

In or around 2009, defendant's relationship with Jane's mother was "[o]ff and on" and he "got into a relationship" with Beatrice, with whom he lived on a more permanent basis.

Sometime in May 2016, Jane ran away from home. Jane's mother called defendant, who searched the neighborhood "[f]or a few hours," but to no avail. Later, Jane called and "told [him] that her and her mom got in a fight, she don't want to be there, and she's tired of it." Defendant asked to "meet up" because he "want[ed] to see if [she was] okay." Jane "said yeah." Defendant and Jane met at a mall and "started talking." She reiterated "she didn't want to go back, that she's tired of it." Defendant offered to take Jane to various places, including her aunt's house or his automobile repair shop, but "she didn't want to go nowhere." At some point, he "drove [her] around." Eventually, Jane suggested staying at a hotel. Defendant "got a room" "between like 2:00 and 3:00" in the afternoon, dropped her off, and went "back to [his] shop." "[B]etween 12:00 and 1:00 in the morning," he returned to the hotel "[t]o check up on [Jane]" and saw she was asleep. Defendant slept on the couch and woke up at "3:30, 4:00 in the morning." He roused Jane and told her he "was leaving" for work and "to call" "if she needed anything." At "9:30, 10:00" a.m., Jane called and asked for food. Defendant "got her some food" "right before checkout." He "told her that she gots to call her mom, to talk to her, see what's going on." Jane called her mother and "got in a big ole argument again . . . ." When Jane declared "she's not going back" and could not be convinced otherwise, defendant booked the room for another night and went back to work. Later that evening, she called and told him "[her] mom knows where [she's] at" and she was leaving the hotel. Thereafter, Jane's mother called defendant and told him "they found [Jane]."

Defendant denied engaging in any sexual intercourse with Jane, touching her vagina, and having her touch his penis. He also denied buying her gifts to either obtain her silence or pressure her to participate in sexual acts.

10.

On cross-examination, when asked whether "there [was] a time that [he] had an intimate relationship with [Jane's mother] and Beatrice at the same time" (boldface omitted), defendant answered: "Not like the same day, but, you know, like, you know, I used to jump back and forth." When asked whether Jane's mother "kn[e]w that [he] w[as] seeing Beatrice while [he] w[as] technically seeing her too" (boldface omitted), defendant answered: "Yes." He also testified Beatrice "didn't really know about [Jane's mother] until later on."

## III.    Prosecution's rebuttal

### a. *Testimony of Detective Canales*

Detective Canales of the Fresno Police Department's sexual assault unit interviewed defendant. He initially told her Jane "contacted him" but later "recanted and . . . said that he initiated contact with her via [social media] . . . ." Defendant "asked [Jane] to meet him" and "it was his idea to rent the room." During the interview, Canales noticed defendant "was really nervous," "kept shutting his eyes," and "backed up into the corner." Based on her training, she believed "something bad happened and he wasn't being [completely] truthful about what he was telling [her] in the interview . . . ."[3]

On cross-examination, Canales rejected the suggestion defendant's demeanor could be attributed to fatigue or anxiety over being accused of sexual misconduct. She "read his body language" and concluded he was being deceitful based on the "combination of the sweating, shutting his eyes, and just appearing nervous, uncomfortable, not wanting to be there." Canales also pointed out defendant "didn't yawn . . . ."

---

[3] The jury watched a video recording of the interview.

## IV. Defense's surrebuttal

### a. *Testimony of defendant*

At the time of the interview with Canales, defendant was tired because he "didn't get no sleep," "they kept [him] in the police car like for a long time," and "it was real hot that day" and "it just drained [him]." In addition, he was "nervous" and "scared." When asked why he kept closing his eyes during the interview, defendant explained he "ha[s] a bad allergy" and his eyes are "always watering and . . . always itching."

## V. Jury instruction

Prior to summations, the court issued CALCRIM No. 200 (Duties of Judge and Jury), which read in part:

> "You must decide what the facts are. It's up to all of you and you alone to decide what happened based only on the evidence that has been presented here to you in this trial.
>
> "Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes but is not limited to, bias for or against the witnesses, attorneys, defendant, or alleged victim, based on disability, gender, nationality, national origin, race, ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status."

The court also issued CALCRIM No. 222 (Evidence), which read in part:

> "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case but their remarks are not evidence. . . ."

## VI. Summations

At the outset of his closing argument, the prosecutor remarked:

> "Ultimately this case is a case about betrayal, betrayal of trust. The defendant, as you know, was essentially [Jane]'s stepfather, somebody that has raised her from a very young age. Somebody that admittedly, when he took the stand, essentially admitted to all of us that he was leading a double life with multiple women. [Jane's mother] being one of them, father of five of h[er] children. Having another relationship on the side with Beatrice

12.

. . . , who testified yesterday. And, while at the same time, carrying on a relationship with his own stepdaughter [Jane]."

During his argument, the prosecutor pointed out Jane's behavior during the period she was molested by defendant was consistent with child sexual abuse accommodation syndrome.

In his closing argument, defense counsel Mark Siegel stated:

"[Defendant] is not on trial for being a philanderer. He is not on trial for being a Don Juan. He's not on trial for having multiple relationships with several adult women. You have not been provided with any sort of evidence or expert testimony which would suggest any sort of nexus between affairs with multiple adult women and being a pedophile. And you've also been instructed not to judge anyone based on their lifestyle.[4] So please disregard that very improper remark by the D.A. and judge this case simply based on the evidence that you've been presented."

In his rebuttal, the prosecutor responded:

"I'd like to start off by addressing something that Defense counsel had stated at the outset of his closing argument. I have great respect for Defense counsel. We have had a number of cases together, but I think that he's wrong here in saying that my arguments about the defendant's relationship with multiple women is improper. It's not improper. It's about credibility. This entire case is about credibility. It's about who you believe and who you don't believe. And so you have to think to yourselves that if the defendant is going to lie about other women to protect himself, cover it up, what is he going to lie to you about, the jury, when he's on the witness stand? And so I submit to you that it was entirely proper to comment on his different relationships with different women. And I would even go further and comment that that has bearing and relevance on how he treats women in general. So that is something that you can properly consider in this case."

---

**4** Siegel clarified at a July 30, 2021 hearing:

"I don't think in any of the admonitions the Court gives the jury there's a specific admonition not to consider the defendant's lifestyle along with race, ethnicity, sexual orientation, but it violates the spirit of that jury instruction and of that admonition." (See *ante*, at p. 12 [regarding CALCRIM No. 200].)

# DISCUSSION

## I.      Motion to substitute counsel

### a.  *Background*

A felony complaint was filed June 2, 2016.  At the June 3, 2016 arraignment on the complaint, the trial court appointed the public defender to represent defendant.  At a July 12, 2016 prepreliminary hearing, private counsel Roger T. Nuttall appeared on defendant's behalf and the public defender was removed as attorney of record.  Nuttall represented defendant at the November 8, 2018 preliminary hearing, at which the court granted the prosecution's motion to amend the felony complaint to conform to proof and found sufficient probable cause to hold defendant to answer.  The information was filed November 16, 2018.  At the November 21, 2018 arraignment on the information, Nuttall represented defendant.

At a January 3, 2019 hearing, two attorneys appeared on defendant's behalf: Nuttall and private counsel Alex de la Fuente.  Thereafter, Nuttall filed a motion to withdraw as attorney of record.  At a May 30, 2019 hearing, the court appointed the public defender to represent defendant and Nuttall was relieved as attorney of record.  At a June 20, 2019 hearing, due to "an attorney conflict," the court appointed the law firm of Ciummo and Associates to represent defendant and the public defender was relieved as attorney of record.  Siegel, a member of the firm, became defendant's attorney of record.

Trial commenced June 1, 2021, over which Judge David Andrew Gottlieb presided.  On June 10, 2021, the jury found defendant guilty as to counts 1 through 8 and not guilty as to count 9.  On June 28, 2021, Siegel filed a new trial motion.

At a July 9, 2021 hearing, which defendant, Jane, and Jane's family attended, Judge Adolfo Corona stated:

> "I said it off the record, but I'll say it again, my apologies for everybody.
> Judge Gottlieb is away and it wasn't planned.  And so I'm covering for him
> and we missed on the notice to everybody of that issue.  It's not meant as a
> disrespect.  Apologies.  So today's on for sentencing.  There's a motion for

14.

new trial. It is Judge Gottlieb's courtroom, it was his trial. He'll have to address it. And I believe counsel have, after conferring with [defendant], the victim and victim's family, that July 30th would be the new date. . . . [¶] . . . [¶]

". . . All right. We have a plan. Motion for new trial and a sentencing. . . . I think we're good to go on that. And we should note if there's – the family and victim plan to be here so if there's any problem, they should get advance notice."

At a July 30, 2021 hearing, Siegel appeared "on behalf of [defendant]" while Nuttall "appear[ed] as well . . . hoping to substitute in for purposes of motion for a new trial at sentencing." The following colloquy transpired:

"[PROSECUTOR]: . . . Your Honor, the People would object to Mr. Nuttall coming in on the case on the eve of sentencing. We have a motion set today. Your Honor wasn't here at the last hearing, but Judge Corona made a lengthy record about how having to continue sentencing inconvenienced the victim in this case, the victim's family who were present on the previous dates. They are again present today. They have made arrangements – I know at least one of them to be here having taken time off of work.

"Your Honor heard the trial. Was the presiding officer for the trial. This was a very traumatic case for the victim and for her to repeatedly have to come to court and mentally prepare to address what happened I think is just unfair for Mr. Nuttall – you know, Mr. Nuttall and I have worked well together in the past, but I would just also remind the Court that Mr. Nuttall had previously asked to be withdrawn as attorney of record in this case and now he wants to come in after the fact after Mr. Siegel has already done the trial. So [defendant] is represented. He has good counsel, a counsel that filed a [m]otion for new trial, a counsel who I understand is prepared to proceed today for sentencing and to hear the motion for new trial.

"THE COURT: Okay. And I think, Mr. Nuttall, I do have some concerns about this motion or this request at this late hour in the proceedings. I think certainly there are other potential remedies for [defendant] to proceed on after the Court makes its rulings on this situation. There certainly are some remedies or some other methods for him to proceed after the Court has gone forward with sentencing. I do have the concerns – that I share the concerns that were probably put on the record previously by Judge Corona. There are – you know, there is a motion

15.

before the Court which sets forth some potential grounds for the Court to determine whether or not a new trial is warranted in this case.

"The Court has reviewed those and is prepared to rule on those. I think it's – you know, I did hear the trial. I think the Court is under an obligation as well that if there were some infirmities in what was done or there was any issues in regards to the due process rights of [defendant] throughout that trial, this Court could independently make some determination as to those infirmities. [¶] . . . [¶]

"MR. NUTTALL: May I be heard?

"THE COURT: Yes. Go ahead, Counsel.

"MR. NUTTALL: As I told [the prosecutor] yesterday in an e-mail, it's important to note that it's not my intention to inconvenience anybody here. We were just retained on this case to represent [defendant] on July 28th I believe it was. And I advised – I advised counsel at that time that I wished to substitute in to supplement the motion for new trial.

"In fact, when we were retained, we contacted the court reporter to proceed to prepare the transcript such that the motion for new trial may be expanded upon and supplemented by specific reference to the record in this regard. We have already paid for that. I don't know how far the reporter is into the preparation of that. But this is a serious case with serious ramifications and it's only our desire to be able to assist [defendant] in affording him the effective assistance of counsel by being able to expand on the issues attended to the motion for new trial.

"I'm appreciative that this is an inconvenience to the victim and I don't mean to be disrespectful to them in that regard, but due process concerns should indeed override that type of inconvenience, particularly in a case of this magnitude, and that's my point. [Defendant] is not going anywhere. He's in custody. We're not going to be seeking his release from custody. And the bottom line is . . . that any prejudice should be outweighed by the due process concerns that are obviously in issue here. And it's really important in a motion for new trial to be able to cite to the record and prepare the case properly such that there's an appropriate record on appeal.

"Here again we're going to – we're all going to be present, hopefully God willing, over the next few years and we should have the transcript fairly soon and we would [be] able to proceed to do the motion for new trial. People are inconvenienced all the time in court because due process

16.

concerns override those particular problems.  I can't help it that these people were only able to retain my services this past week.  That's simply the way it goes and I'm sincerely asking that the Court grant our request to substitute in and continue the case under these circumstances.

"[PROSECUTOR]:  And, Your Honor, I would only add that he does have counsel.  Mr. Siegel was the person who did the trial.  He's best positioned to go forward with sentencing in my opinion.  It's not as if [defendant] is working on his own without counsel.  And, again, I would just note that Mr. Nuttall asked to be withdrawn from this case previously and now he wants to come in on the eve of sentencing.

"MR. NUTTALL:  Your Honor, for the record, let me just say this.  I have the utmost respect for Mr. Siegel.  He knows it and this is no criticism of him.  This is sincerely made to assist in affording [defendant] the opportunity to expand upon the motion for new trial through my efforts and through our expense.  This is an important case.  It's too serious to not consider the prospect of an appropriate record being able to be cited to at the time of the hearing on the new trial motion.  I understand what the Court is saying, that he has a right to appeal.  That's really not the same as what I'm requesting here.  A new trial motion is important with reference to the prospect of appeal and establishing the appropriate record based upon the actual record and that is of significant importance here.

"THE COURT:  Counsel, and the main thing that I am kind of at – I don't have at my fingertips is, you know, I recognize that [defendant] does have a right to hire counsel, but I think that that right to hire counsel is not absolute.  I'm just wanting to see if there's something that I can put my fingertips on that talks about the discretionary nature of the Court allowing for that substitution at the time of sentencing.  And –

"MR. NUTTALL:  Well, I think that – my point is . . . that the exercise of discretion simply have to take into consideration the due process component that I have set forth in terms of being able to effectively present all the relevant issues attendant to the new trial motion which would require being able to address an entire record from the trial and that's what I intend to do.

"THE COURT:  All right.  So, counsel, the Court is looking at some basic case law on this and the Court does have discretion to refuse to permit a substitution of attorney if it would delay the trial or cause other interferences with the process of justice.  And I'm looking at – it cites to the cases of People [v.] Ortiz [(1990)] 51 Cal.3d[] 975.  It also cites to the case of People versus Durham.  In that case the motion was made on the first

day of trial.[5]  Likewise there was another case where the case had been pending for two and a half years and there was a motion made on the day the case was called for trial.  There was another one.

"So it goes on to basically cite those cases and say in making the determination the Court must balance the defendant's interests in new counsel against the disruption, if any, flowing from the substitution.  And I think that in this particular case –

"MR. NUTTALL:  If I can address that?

"THE COURT:  Hold on.  Hold on, counsel.  You know, the People have put forth their concerns.  This case I know is quite old to begin with. . . .  [¶] . . . [¶]  . . . [T]he allegations are from 2013.  I think that made the trial at the outset complicated because of the age.  I know that there were a lot of things that witnesses could not remember because of the age of the case.  And, Mr. Nuttall, during a portion of that trial, you represented [defendant].  And so I have to weigh – the cases say that I need to weigh that.  And I think I heard your position on it in terms of his due process rights, his right to counsel.  And whereas I acknowledge that, I think that, you know, in most cases, or in a lot of cases, the Court would be in favor of perhaps granting the request, but we have a very unusual case here.

"We have a case where the young person at the time went on the witness stand.  She's been waiting for that day for many, many years and now you're asking to postpone it who knows how long.  I know that you will try and work diligently, but at the same time once you have the case, you have a right to be prepared.  You have a right to review the transcripts, you probably have a right to have contact with Mr. Siegel, do your own investigation, all of that.  It could be another year before we actually address the motion to withdraw – or the motion, you know, for new trial and the Court just doesn't feel that's appropriate under all the circumstances in this case.

"MR. NUTTALL:  If I may be heard, Your Honor?

"THE COURT:  Very briefly, counsel.  I have already heard your argument, but very briefly –

"MR. NUTTALL:  Well, the bottom line here is that the – this is not on the eve of trial.  The trial is over.  The victim has testified.  This case has gone on for some time.  Nothing is changing other than a delay in the

---

[5] It is likely the court was referring to *People v. Durham* (1969) 70 Cal.2d 171.

18.

hearing on the motion for new trial and that should not inconvenience the People, it should not inconvenience the Court, and as far as the victim is concerned – and, again, with due respect, the victim is not going to have to be testifying again. That's over with. The point is we want to establish an appropriate record for the motion for new trial as it relates to that and post-trial proceeding on appeal and that is what is important here. Everything has been accomplished. We're simply talking about a delay in having the hearing on the motion for new trial. That shouldn't inconvenience anybody.

"THE COURT: I disagree with that and I think the People would disagree with that as well. You know, the victim and the victim's family are here. They want to have sentencing completed. They want to have some closure with this case and I think that there's an entitlement to that. Closure doesn't necessarily happen when a trial is over. You know, this has been a very long journey I'm sure for the victim in this case. She was, you know, traumatized in about the worst way that a child could be. I think there's definitely a very big interference with what we call justice by continuing to delay the finality of the sentencing. So I disagree with your assessment that there's no inconvenience here.

"Also, it means that we have to continue these processes for who knows how long. Again, you know, it could take[] months. It could take a year before you get your motion filed and the hearing is held on it and the Court, just in looking at the citations to these cases, feels that because it's within the Court's discretion to deny it, the Court feels it's appropriate to do so. So the Court is going to deny the request for substitution of attorney at this point in time. Thank you, counsel."

b. *Analysis*

"[A] defendant may discharge appointed counsel only if that lawyer is rendering inadequate representation or there exists an irreconcilable conflict between counsel and client . . . ." (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 428 (*Keshishian*); accord, *People v. Lara* (2001) 86 Cal.App.4th 139, 150.) "We review a trial court's decision not to discharge appointed counsel under the deferential abuse-of-discretion standard." (*People v. Wright* (2021) 12 Cal.5th 419, 440.) Ultimately, a reviewing court is "required to uphold [a discretionary] ruling if it is correct on any basis, regardless of

19.

whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)

The record demonstrates Siegel was employed by Ciummo and Associates, the law firm appointed by the trial court to represent defendant at trial. On June 28, 2021, a little over two weeks after the jury rendered its verdict, Siegel filed a new trial motion. On July 28, 2021, defendant rehired private counsel Nuttall. At the July 30, 2021 hearing, Nuttall appeared and stated he "wished to substitute in to supplement the motion for new trial." A defendant who seeks to obtain new counsel "necessarily indicates some dissatisfaction with the attorney who has been representing him." (*People v. Molina* (1977) 74 Cal.App.3d 544, 549 (*Molina*).) However, "some dissatisfaction" does not invariably constitute either an assertion of inadequate representation or the existence of an irreconcilable conflict between counsel and client. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1092 (*Barnett*) [" 'disillusion[ment]' " with counsel did not amount to "such an irreconcilable conflict that ineffective representation was 'likely to result' "]; *Molina*, *supra*, at p. 549 ["[D]issatisfaction with an attorney's performance which is [legally] adequate . . . is not a basis on which a continuance to permit a substitution of attorneys must be granted."].) "The resolution of the issue depends upon the circumstances of each case." (*People v. Rhines* (1982) 131 Cal.App.3d 498, 506.)

At the aforementioned hearing, Nuttall stated the substitution-of-counsel motion was "sincerely made to assist in affording [defendant] the opportunity to expand upon the motion for new trial through my efforts and through our expense." At most, he implies there was disagreement with Siegel over how to advance the new trial motion. "A trial court is not required to remove appointed counsel because of disagreement as to . . . strategy" where the disagreement has not "resulted in a breakdown of such magnitude as to jeopardize defendant's right to effective assistance of counsel." (*People v. Rhines*, *supra*, 131 Cal.App.3d at p. 505; see *Barnett*, *supra*, 17 Cal.4th at p. 1092 ["That [counsel] refused to accede to defendant's demands on various tactical matters . . . ,

standing alone, did not constitute sufficient cause for substitution of counsel."].)
Furthermore, Nuttall added he "ha[s] the utmost respect for Mr. Siegel" and the motion to substitute was "no criticism of him." (See *Barnett*, *supra*, at p. 1092 [the defendant described counsel as " 'a great guy' "].) Defendant and Nuttall "made no reference to an irreconcilable conflict." (*Ibid.*) Siegel "did not join in the motion for substitution or otherwise suggest that such a conflict existed." (*Ibid.*) Finally, "the record does not indicate that defendant and [Siegel] had become embroiled in such an irreconcilable conflict that ineffective representation was 'likely to result.' [Citation.]" (*Ibid.*) Hence, denial of the substitution-of-counsel motion to substitute counsel was appropriate.[6]

We recognize the trial court mistakenly employed the standard for discharging retained counsel, under which a defendant "may discharge retained counsel for any reason" (*Keshishian*, *supra*, 162 Cal.App.4th at p. 428) and a request to discharge retained counsel may only be denied " 'if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" ' " (*ibid.*). (Accord, *People v. Ortiz*, *supra*, 51 Cal.3d at p. 983; see *People v. Durham*, *supra*, 70 Cal.2d at p. 191.) This error "inured to defendant's benefit" (*People v. Parson* (2008) 44 Cal.4th 332, 371, fn. 19) because "the

---

[6] Defendant did not contend below (and does not contend on appeal) the trial court should have conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. (See *Molina*, *supra*, 74 Cal.App.3d at p. 548 [*Marsden* establishes a "defendant seeking a substitution of attorneys is entitled to be heard on the facts underlying his claim" and *Marsden*'s progeny "expand[s] the duty of the trial court from one of affording an opportunity to the defendant to state his reasons for a claim of inadequate representation to one of also affirmatively inquiring into the circumstances of any claim of counsel ineffectiveness"].) Even if he had, the court's duty under *Marsden* was not triggered because defendant's request for substitution of counsel was not explicitly premised on Siegel's inadequate representation or the existence of an irreconcilable conflict between defendant and Siegel. (See *People v. Wright*, *supra*, 12 Cal.5th at p. 440; see also *People v. Martinez* (2009) 47 Cal.4th 399, 422 [" '[T]he duty to inquire is not triggered merely because of "a vague, unspecified possibility of conflict." ' "].)

right to discharge retained counsel is broader than the right to discharge appointed counsel" (*Keshishian*, *supra*, at p. 429). Even under a more favorable standard, the court denied the substitution-of-counsel motion. In any event, "[t]he fact that the action of the court may have been based upon . . . an improper or unsound course of reasoning . . . cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.*, *supra*, 116 Cal. at p. 329.)

## II. Motion for new trial

### a. *Background*

On June 28, 2021, Siegel filed a new trial motion, arguing the prosecutor—in his closing argument—"alluded broadly to the fact that [defendant] was sleeping with two different adult women during a portion of the same time period and urged this as a factor pointing toward defendant's guilt of having engaged in illegal sexual activity with an underage girl." He added the prosecutor—in his rebuttal—"effectively 'doubled down' on his earlier remarks concerning [defendant]'s acknowledged lifestyle, asserting that not only was [defendant] not a credible witness due to his deceptiveness in maintaining a dual lifestyle but that as a philanderer, he was expressing disrespect towards women and therefore more likely to be engaging in illegal activity with an underage girl." Siegel acknowledged he "did not object to the court or ask for an admonition to these remarks" and suggested the trial court "is empowered to find that [defendant] was not afforded a fair trial" "should [it] find that [defendant] suffered ineffective assistance of counsel as a result of defense counsel's failure to object to the prosecutor's inflammatory remarks."

22.

At the July 30, 2021 hearing, after denying the substitution-of-counsel motion (see *ante*, at pp. 15-19), the trial court considered the new trial motion. Siegel argued the prosecutor's remark about defendant "seeing two women at the same time" was "obviously intended to inflame the prejudice of the jury." The prosecutor countered "the prosecution was in its rights to call out and bring attention to the defendant's proclivity to being untruthful" and—given the jury acquitted defendant on count 9—the jury was not "blinded" by the remark and "considered carefully" "the evidence in the case." The court denied the new trial motion, finding no "error or improper closing argument by the People" and no "ineffective assistance of counsel." It explained:

> "So I certainly remember [the prosecutor] alluding to the issue of the relationship that [defendant] was having with two different women at the same time. I also seem to recall [defendant] admitting on the stand that he would lie to one or the other of them in regards to that relationship and his intentions were to keep one relationship secret from the other. Obviously, when []he testified, I think the gig was up, if it wasn't up before that, because he needed to acknowledge that he had both these relationships and was misleading both of them at the same time.

> "And so – and then I think that when [Beatrice] testified, I believe that's his current – or one of his current girlfriends that he has a relationship with, she also had concerns about the fact that he might have been, quote, unquote, cheating on her. So all of this really came out through his own case that he was presenting. And I recall, Mr. Siegel, that you brought to the attention of the jury exactly what you said here and that is that just because somebody is a philanderer, you might not like that, but that's not what this trial is about. I think that was brought very much to light in front of the jury. And, you know, the jury instructions were pretty clear on – you know, it was said multiple times that what counsel argue are not facts. However, it is I think logical argument that could be made based upon the way in which the facts came out.

> "So pointing out the fact that it was – he was engaged in relationships with two women and not being honest with them about that relationship, I think is appropriate. Trying to link that type of scenario with having a character trait consistent with child molestation of course would be improper and I think that that's kind of what counsel is hitting upon. I don't feel that there was so much placed on that particular issue that it led

23.

to some focus on that, such that the jury would make a conclusion that, hey, this guy is involved in a couple of relationships at the time that this happened so therefore he must be a child molester. I don't think that that was the argument and I don't think that that was the way in which they approached their task. Of course none of us interviewed them afterwards, but both counsel pointed out how that applied just to honesty and Defense counsel I think pointed out that one doesn't mean the other. Of course there was no testimony about any collaboration – not collaboration, you know, analysis between whether one is predictive of the other. There was certainly not any expert testimony of counsel mentioned that would address any type of profiling of [defendant] and I don't think that that was the thrust of the People's argument.

"Overall I don't think – I think that [the prosecutor's] argument was, you know, on the line in terms of what's appropriate and what's not appropriate. I don't think that that was of the thrust of his argument or with the primary area of his argument. I think it was but a part of his testimony – or not his testimony, his argument. I know that he referred a lot to things that the victim did that were consistent with Mr. Love's testimony. He pointed out the consistencies in her testimony. Pointed out the manner in which she testified and pointed out to a fair degree as to the things that were consistent with some of the other witnesses. I think that that was his primary thrust of his argument, that the other portions of his arguments were in order to highlight the inconsistencies and the untruthfulness that [defendant] demonstrated with this relationship.

"And the final thing is . . . whether or not – and I think that kind of dovetails into this very last argument as to the prejudice. I don't find that in the totality of the circumstances here that we have a situation that prejudiced [defendant] in such a way that he did not receive a fair trial. I think Mr. Siegel did a very good job in handling this case. It's a difficult case and I think that, you know, [defendant], when he testified, he put a lot of things out there that I think put in to question his credibility. And I think that when coupled with all the other evidence, the jury made the determinations that they did beyond a reasonable doubt."

b. *Analysis*

" 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) " ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and

24.

unmistakable abuse of that discretion." ' [Citations.]" (*Ibid.*) "Although this standard of review is deferential, 'it is not empty . . . . [I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.]" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659 (*Andrade*).) "The appellant has the burden to demonstrate that the trial court's decision was 'irrational or arbitrary,' or that it was not ' "grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citation.]' [Citations.]" (*Ibid.*)

For the reasons set forth below, we conclude the court's denial of the new trial motion did not constitute an abuse of discretion.

### i. Prosecutorial misconduct

A new trial is proper "when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial . . . before a jury . . . ." (§ 1181, subd. 5.) " ' "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." ' [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 72 (*Parker*).) " '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

At trial, defendant admitted he "used to jump back and forth" between Jane's mother and Beatrice. While he stated Jane's mother knew he had an intimate relationship with another woman, he conceded Beatrice did not "until later on." Beatrice testified she suspected defendant "was secretly seeing [Jane's mother] behind [her] back" (boldface omitted) and confronted him multiple times. In his closing argument, the prosecutor juxtaposed defendant's "double life with multiple women" with Love's expert testimony,

25.

which provided a framework—i.e., child sexual abuse accommodation syndrome—by which to evaluate the veracity of Jane's account of what transpired.  In our view, the prosecutor relied on defendant's dishonesty with respect to Beatrice and the consistency between Jane's behavior and four out of the five categories of child sexual abuse accommodation syndrome to show defendant's testimony was less believable than Jane's. (See *Parker*, *supra*, 13 Cal.5th at pp. 72, 78 [prosecutor given wide latitude during closing argument to make fair comment on and draw reasonable inferences from evidence presented at trial]; see also Evid. Code, § 780, subds. (i), (k) [jury may consider a defendant's "admission of untruthfulness," "[t]he existence . . . of any fact testified to by him," or "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing"][7].)  Such an approach made sense given the instant case essentially boiled down to a " 'he said—she said' credibility contest." (*People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1020.)  We cannot find a reasonable likelihood the jury construed the prosecutor's remarks about defendant's polyamory to "correlate[] with pedophilia . . . ."  Nor can we find his remarks " ' "either infect[ed] the trial with such unfairness as to render the subsequent conviction a denial of due process, or involve[d] deceptive or reprehensible methods employed to persuade the trier of fact." ' [Citation.]"  (*Parker*, *supra*, 13 Cal.5th at p. 72.)

### ii.  Ineffective assistance of counsel

"A new trial may be granted where the trial court finds that the defendant received ineffective assistance of counsel." (*Andrade*, *supra*, 79 Cal.App.4th at p. 659; see *People v. Callahan* (2004) 124 Cal.App.4th 198, 209 ["Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under . . . section 1181, motions alleging ineffective assistance are permitted pursuant to 'the constitutional duty of trial courts to ensure that defendants be accorded due process of law.' "].)  "To

---

[7] We reject defendant's suggestion Evidence Code section 780 is irrelevant.

prevail on this ground, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to [the] defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*Andrade*, *supra*, at pp. 659-660; see *People v. Wharton* (1991) 53 Cal.3d 522, 575 ["Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "].) "It is . . . particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Defendant reiterates Siegel rendered ineffective assistance by failing to object to the prosecutor's remarks about his polyamory during his closing argument. As discussed, these remarks did not constitute prosecutorial misconduct. "Because [an] objection on the ground now asserted by defendant would have been futile, trial counsel's failure . . . to object to the prosecutor's argument was not deficient performance." (*People v. McDermott* (2002) 28 Cal.4th 946, 992.)

Defendant adds Siegel rendered ineffective assistance by failing to object to the prosecutor's "misrepresent[ation of] the record of the July 9, 2021, hearing." Specifically, defendant claims the prosecutor made "a false assertion that Judge Corona had 'made a lengthy record' about a concern of 'continu[ing] sentence' as it would 'inconvenience' [Jane]." (Italics & underscoring omitted.) At the time the challenged statement was articulated, the court was considering the substitution-of-counsel motion. (See *ante*, at pp. 15-19.) The record before us " 'does not illuminate the basis for the

27.

attorney's challenged acts or omissions . . . .' " (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329.) Siegel was never asked to explain why he did not object. Furthermore, " ' "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" [citation].' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 609-610; see *People v. Jones* (2003) 29 Cal.4th 1229, 1254 [" ' "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " ' "].)

## III. Additional claims of ineffective assistance of counsel

In his brief, defendant alleges other instances of Siegel rendering ineffective assistance, such as (1) failing to object to Detective Canales's testimony as to defendant's truthfulness during a police interview; and (2) failing to object to the prosecutor's remarks during the hearing on the substitution-of-counsel motion that "misstated the law" and "practically mock[ed] [defendant]'s right to counsel of his choice." (Boldface & capitalization omitted.) Once again, the record before us " 'does not illuminate the basis for the attorney's challenged acts or omissions . . . .' " (*People v. Silvey*, *supra*, 58 Cal.App.4th at p. 1329.) Siegel was never asked to explain why he did not object. Once again, " ' "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" [citation].' [Citation.]" (*People v. Gurule*, *supra*, 28 Cal.4th at pp. 609-610.)

## IV. Cumulative error

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "A claim of cumulative error is in essence a due process claim . . . ." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*Ibid.*) "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have

reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

Having reviewed and analyzed each alleged error, we cannot conclude the cumulative effect was such that defendant was deprived of due process and a fair trial. Therefore, we reject the argument.

## **DISPOSITION**

The judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.