Filed 7/29/25  P. v. Alford CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>JASPER W. ALFORD, JR.,<br><br>      Defendant and Appellant. | C098949<br><br>(Super. Ct. No. 52587E) |

Defendant Jasper W. Alford, Jr., appeals from the trial court's denial of his petition for resentencing made pursuant to Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 2) (Senate Bill 1437).  Alford was convicted of second degree murder in 1979 as an aider and abettor.  He contends the trial court erred in denying his resentencing petition because (1) substantial evidence does not establish he committed the necessary actus reus and harbored the requisite mens rea for aiding and abetting either

1

express or implied malice murder; and (2) the court erred by refusing to admit into evidence a prosecutor's exculpatory statement from a codefendant's subsequent retrial.

We disagree with the arguments and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

We rely on our opinion in Alford's direct appeal to provide relevant background facts. (*People v. Croy and Alford* (Apr. 28, 1981, C010477) [nonpub. opn.] (*Alford I*).) We also rely on the trial testimony of several law enforcement officers from Alford's 1979 trial.

Patrick Croy and Norma Jean Croy are brother and sister; Darrell Jones and Alford are cousins of the Croys, and Carol Thom is a cousin of Alford. The criminal incidents at issue occurred on the evening of Sunday, July 16, 1978, and in the early morning hours of July 17, 1978.

Late that Sunday evening, police arrived at an apartment complex in Yreka where Willy Griffith was hosting a party. Neighbors overheard a conversation between the police and Patrick Croy, Jones, and Thom. The conversation made Croy angry, and he had to be restrained. After the police left, one male was overheard saying, "Let's get the guns and shoot the sheriffs." A second male replied, "If you can get a gun, I can get some guns and we'll tear Yreka apart tonight." The female said, "You get the guns and I'll get Willie."

About 20 people attended Griffith's party, including Patrick Croy, Norma Jean Croy, Alford, Jones, and Thom. When the party broke up, Griffith drove Patrick Croy, Alford, Thom, Jones, and others to Croy and Barbara Conrad's apartment. On the way, they picked up Norma Jean Croy. When they arrived, Patrick and Thom went inside, and Patrick asked Conrad for some bullets. She did not give him any. Patrick looked for some bullets but did not find any. He grabbed his .22 magnum lever action rifle, and he and Thom returned to Griffith's car.

2

Griffith drove the group to Montague to get Thom's car. During the ride, Thom stated she "wanted to get some cops." Patrick Croy, Alford, and another rider each held the rifle. At Montague, Griffith dropped his riders off. As he left, he heard the others say something about going deer hunting and getting some bullets.

John Thurman was a clerk at the Sports and Spirits Liquor Store in Yreka. On the evening of July 16, 1978, Patrick Croy and others entered the store. Croy bought some beer and paid with a two-party check. He thought he had been underchanged, and after an argument, Thurman gave Croy $2 too much change.

Patrick Croy re-entered the store around midnight, later joined by Norma Jean Croy, Thom, and another person. Alford remained in the car. Thurman asked for the $2 back, and Thom, using vulgarities, asked Thurman what his beef was. Thurman asked her to leave. The four remained, however, and Thom attempted to knock down a cigarette tray and knocked over a card holder. Thurman told her to get out and went to call the police. As he picked up the receiver, Norma Jean Croy grabbed him from behind and pressed a sharp object into his back. Thom shouted, "Stab him, stab him," and she joined in the attack, pulling Thurman's hair, grabbing his cheeks, and striking his head. Norma Jean told Thurman not to give her any trouble or she would "shove it all the way in."

When Norma Jean Croy released the pressure on his back, Thurman pushed the two women away, ran out the door to a Union 76 gas station, and told the owner to call the police. He saw someone run from the store and get into a car at about the same time he saw a police unit arrive. He pointed his finger at the defendants' vehicle and said, "Get them." He then returned to the store where he noticed that the case in which the store kept ammunition was overturned.

Officer Charles Cloyd was a patrolman with the Yreka Police Department. At approximately midnight, he was in the vicinity of the Sports and Spirits Liquor Store, and he observed Thurman run from the store to a gas station. He pulled into the gas station

3

and heard Thurman yelling, and then noticed two persons, one of whom he recognized as Norma Jean Croy, run from the liquor store to the car.  Norma Jean shouted something to the effect of "It's the police, let's get out of here," and the car sped out of the parking lot. Cloyd followed the car and activated his lights and siren.  The suspect vehicle did not stop but continued through town, running stop signs, and it left town on Highway 263.

Officer Cloyd continued to follow the suspect vehicle, and he was joined by Officers Callahan and Quigley in their units.  Along the way, someone reached out of the suspect vehicle's left side twice, and on the second time fired a shot at the pursuing police.  After the shot was fired, the vehicle turned off the highway onto a dirt road known as Rocky Gulch Road.  The officers followed the vehicle to the top of Rocky Gulch Road where it stopped at a cabin in which Mrs. Edith Croy, grandmother of some of the defendants, lived.

When Officer Cloyd stopped his car, he observed five persons around the suspect vehicle.  He used his vehicle's spotlight to try to identify the persons, told them to stop, and identified himself as a peace officer.  The suspects refused and said they were not going to come to his position or do what he said.  After a few seconds, three of the suspects ran down a small gully and up the hillside.  Cloyd identified the three suspects that ran as Patrick Croy, Jones, and Norma Jean Croy.  After they ran, Cloyd could only see movement by them on occasion.  He identified the two suspects that did not run as Alford and Thom.

By then, Officers Quigley and Callahan had arrived, and the officers attempted to call Alford and Thom to come to their location.  Meanwhile, shots began to come down from the hill.  Alford and Thom remained where they were, refusing to move towards the officers.  They began yelling and screaming loudly, including using foul language. Alford told the officers, "Go ahead and shoot us, go ahead and shoot us."  Officer Quigley heard Alford and Thom yell, "to the effect, kill the pigs, come on pig, why don't

4

you come and kill us, why don't you come up?  What's wrong with you?  Chicken.  Want to kill us, words to that effect."

Using a patrol car mic, Officer Callahan attempted to contact the suspects on the hill to persuade them to stop shooting.  Officer Cloyd believed that if they could get Alford and Thom to be quiet, the officers could establish communication with the suspects on the hillside.  Cloyd and Officer Quigley decided to go out and bring Alford and Thom in, but when Cloyd approached Alford, Alford grabbed him by the shoulders and wrestled with him.  Shots from the hillside then increased with frequency.  Cloyd believed he and Quigley were being fired on.  The officers retreated to the security of some bushes due to a large volley of gunshots from the hillside.  They were unable to bring Alford or Thom with them.

The officers stayed at their location and continued to ask Alford and Thom to come to them.  Officer Quigley moved to a different location, and Officer Jesse Joe Hittson joined Officer Cloyd.  Alford and Thom continued yelling and screaming, "sometimes at the top of their lungs."  They used foul language, and at times would turn to the hillside and shout at the other suspects.  Eventually, Thom quieted down and walked towards the officers.  They took her into custody and handcuffed her to a small tree.  The officers continued to talk to Alford, and he calmed down and was also taken into custody.  They placed him in handcuffs and kept him behind bushes in an area of trees.

After Alford and Thom were taken into custody, Officer Cloyd went towards the cabin where he was joined by Officer Hittson.  When they got to the cabin area, they heard someone shout that an officer, Officer Perkins, had been shot in the hand.  Alford and Thom began shouting again, and Officer Hittson was forced to return to their position to quiet them on two or three occasions so that communication could be established with the suspects on the hill.  Other officers testified that Alford and Thom shouted congratulatory words to those on the hill when Officer Perkins was shot.  Alford yelled,

5

"Well, you have got one of the fucking pigs.  Get some more of them."  Eventually, Alford and Thom were quiet, and Officer Callahan was able to communicate with the suspects on the hillside.

There was a lull in the shooting, and Officer Cloyd heard Jones, say, "Hey, Hooty."  To Cloyd, the name "Hooty" referred to Patrick Croy.  A voice said a yeah or huh.  Jones asked how the ammunition was holding out.  The same voice said he was running low.  Jones said, "[G]ive me the gun.  I want to shoot for a while."

Officer Callahan began talking with Jones through his PA system and told the suspects to come down off the hill.  Officer Cloyd then heard Jones say to somebody, "[L]ook, I've been shot, Norma Jean's been shot in the butt.  Let's go down."  The person that had answered to "Hooty" said he would not go down, and they would have to come and get him.  This person sounded excited and mad.  Jones became more excited, and he told Officer Callahan that he had a gun pointed at him.  He also told Callahan to come up and get him, but if he did he (Jones) would kill everyone.  Callahan continued his unsuccessful attempts to talk the suspects into surrendering.  At one point, Jones told Callahan that he and Norma Jean were wounded but insisted he needed half-an-hour before surrendering.

Officer Hittson went around the side of the cabin.  Officer Cloyd heard a shot.  He saw Hittson falling backwards while discharging his revolver several times.  Hittson said, "Help me, Cloyd," and when asked where he had been hit, he replied, "In the heart."  Cloyd called for help, but by the time an officer and an ambulance attendant arrived, Hittson had died.

On June 29, 1979, a jury found Alford guilty of one count of second degree murder, and it found true that a principal in the offense used a firearm.  (Pen. Code, §§ 187; 12022, subd. (a).)  (Statutory section references that follow are to the Penal Code.)  The jury found Alford not guilty of conspiracy to commit murder, four counts of

attempted murder, four counts of assault with a deadly weapon on a peace officer, and one count of robbery. (§§ 182/187; 664/187; 245, subd. (b); 211.)

The trial court sentenced Alford to a prison term of eight years: the upper term of seven years for the murder plus an additional year for the enhancement.

While this sentence was long ago completed, we note that in a supplemental brief filed in Placer County in 2021, Alford's counsel stated that Alford completed his 8-year prison sentence for this case and was released. In 1987, he was convicted of one count of domestic violence (§ 273.5) with a special allegation of use of a deadly weapon (§ 12022, subd. (b)). In 1995, Alford was convicted of battery on a custodial officer (§ 243.1) and was sentenced to 25 years to life. He has been in custody since this conviction. In his opening brief in this matter, Alford asserts the 25-to-life term is "due to reliance on the murder conviction to enhance his current sentence." The abstract of judgment states he was sentenced to life with the possibility of parole, not 25 to life. In any event, it appears he is currently serving an indeterminate sentence which relies in part on his murder conviction.

We affirmed the conviction in *Alford I*. As part of that decision, we held that substantial evidence supported Alford's conviction for second degree murder under a natural and probable consequences theory of aiding and abetting.

In February 2019, Alford petitioned for resentencing pursuant to section 1172.6.[1] (*People v. Alford* (Mar. 30, 2021, C090825) [nonpub. opn.] __ Cal.App.5th __ [2021 Cal.App.Unpub.LEXIS 2104].) The trial court summarily denied the petition at the prima facie stage, and Alford appealed. (*Ibid*.) We reversed and remanded for further proceedings. (*Ibid*.)

---

[1]  When Alford filed his petition, the relevant section was 1170.95. That section was subsequently renumbered to 1172.6 without change.

The trial court issued an order to show cause and convened an evidentiary hearing. On June 20, 2024, the trial court denied the petition with a ruling from the bench. It determined the prosecution had established beyond a reasonable doubt that Alford was guilty of second degree murder under California law as amended by Senate Bill 1437 on January 1, 2019. The record established beyond a reasonable doubt that Alford "with life-threatening words" directly aided and abetted the killing of Officer Hittson with both express and implied malice.

DISCUSSION

I

*Standard of Review*

By enacting Senate Bill 1437, the Legislature eliminated the natural and probable consequences theory of liability as a basis for a murder conviction. (*People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).) It also provided persons convicted of murder under the natural and probable consequences theory the right to petition the sentencing court to vacate the murder conviction and be resentenced on any remaining counts. (§ 1172.6, subd. (a).) If the trial court issues an order to show cause, it must hold an evidentiary hearing where the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder under California law as amended by Senate Bill 1437. (§ 1172.6, subds. (c), (d).)

Generally, we review a trial court's denial of a section 1172.6 petition for substantial evidence. (*Reyes, supra*, 14 Cal.5th at p. 988.) "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible,

8

and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid*.)

## II

### *Aiding and Abetting Murder*

Although an accomplice may no longer be convicted of murder under the natural and probable consequences theory of liability, an accomplice may still be guilty of murder by directly aiding and abetting the crime. (*People v. Gentile* (2020) 10 Cal.5th 830, 843.) A person who aids and abets the commission of a crime is a principal in that crime and thus is guilty of that crime even if someone else committed some or all of the criminal acts. (§ 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117 (*McCoy*).) A person aids and abets the commission of a crime "when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Viewed another way, every crime except for strict liability offenses has two components: (1) an act or omission (the actus reus); and (2) a necessary mental state (the mens rea). (*McCoy, supra*, 25 Cal.4th at p. 1117.) "This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something *and* have a certain mental state." (*Ibid*.) Specifically, proof of aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

9

Alford contends insufficient evidence supports the trial court's determination that he aided and abetted the second degree murder of Officer Hittson. He asserts there is insufficient evidence of his actus reus. He also asserts the trial court erred when determining he had the requisite mens rea for second degree murder in the form of both express and implied malice.

A. Evidence of actus reus

The actus reus requirement for aiding and abetting is satisfied where the aider and abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Beeman, supra*, 35 Cal.3d at p. 561.) In the context of implied malice mens rea, " 'the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' " (*Reyes, supra*, 15 Cal.5th at p. 991.)

The trial court determined that Alford's actus reus of aiding and abetting consisted of his resistance and his disruptive conduct and "life-threatening words" that delayed and thwarted the officers' efforts to defuse the situation. Statements Alford made while yelling, such as " 'Kill the pigs' " and " 'You've got one of them, get another,' " were words of "encouragement or congratulations" that the shooter made no effort to stop the situation that led to Officer Hittson's death.

Alford contends that insufficient evidence established his actus reus for aiding and abetting second degree murder. He asserts there was "no relation – no immediate temporal nor causal link – between [his] statements" and Patrick Croy's eventual shooting of Officer Hittson. Alford argues that an aider and abettor's conduct must in fact assist the perpetrator in achieving the crime, and his words and actions had no effect on Croy's decision to fire at the police or later to fire at Hittson. He asserts that the trial

10

court's determining his disruptive conduct delayed and thwarted the officers' efforts to defuse the situation is speculation. He claims nothing in the evidence showed that his conduct impacted or influenced Croy's actions, and thus he cannot be guilty of second degree murder as an aider and abettor.

Alford overstates the type of act or advice required for the actus reus of aiding and abetting. The act or advice that is the actus reus need not be a substantial factor in the offense. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743.) Mere presence at the crime scene or failure to take action to prevent a crime are not by themselves sufficient to constitute aiding and abetting. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322.) The aider and abettor must in fact aid, assist, or encourage the primary actor to commit the offense, but there is no requirement that the act or advice be a but-for cause or even an essential factor in bringing about the offense. (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216.) Often, the aider and abettor's act is "innocuous when divorced from the culpable mental state." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1129.)

By statute, an aider and abettor need only be "concerned" in a crime to be a principal in the crime. (§ 31; *People v. Franzen, supra*, 210 Cal.App.4th at p. 1216.) " ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." ' " (*People v. Swanson-Birabent, supra*, 114 Cal.App.4th at p. 743, quoting *People v. Durham* (1969) 70 Cal.2d 171, 185, fn. 11.)

Substantial evidence supports the trial court's determination that Alford by his actions was sufficiently concerned in and aided the murder to be an aider and abettor. He encouraged the shooters to kill the police officers by yelling, "kill the pigs" and, after Officer Perkins had been shot, yelling, "Well, you have got one of the fucking pigs. Get some more of them." His yelling also aided in the commission of the crime by interfering with the officers' attempts to establish communication with the suspects on the

11

hill and defuse the situation. This finding by the trial court was not speculation. At least twice, Officer Hittson retreated from the cabin to get Alford and Thom to stop yelling so that communication could be established between Officer Callahan at the bottom of the hill and the suspects on the hill. Substantial evidence supports the trial court's finding.

Alford argues that the jury's finding Patrick Croy and Norma Jean Croy guilty of conspiracy to commit murder but acquitting Alford on that count reasonably suggests that Patrick Croy intended to shoot the officers regardless of any actions taken or words spoken by Alford. Perhaps, but a person may commit the actus reus element of aiding and abetting simply by facilitating or encouraging the commission of the crime without also being a co-conspirator, as the two concepts of derivative liability are separate. (*People v. Solis* (1993) 20 Cal.App.4th 264, 271, fn. 5, disapproved on another ground in *People v. Prettyman* (1996) 14 Cal.4th 248, 268, fn. 7.) The relevant issue is whether Alford shared Croy's criminal intent and aided him in the shooting, not whether Croy intended to act without Alford's aid.

Alford contends that evidence the trial court erroneously excluded from the trial showed that the prosecution in Patrick Croy's retrial conceded it could not prove beyond a reasonable doubt that Croy had actually heard the words spoken by Alford. We will address the propriety of the court's exclusion of this evidence below. But even assuming for purposes of argument that it establishes that Croy did not hear Alford's statements, it does not establish that Alford did not aid and abet Croy's actions. Alford aided and abetted by interfering with the police officers' ability to establish communication with the shooter and suspects and defuse the situation. His actions facilitated the ultimate shooting of Officer Hittson.

Alford also argues that evidence at his trial established that he had already been removed from the scene and booked into jail before Officer Hittson was shot. Whether that is true is not relevant, as the aider and abettor's presence at the time of the crime is not required to establish liability. (§ 31.)

12

For all the above reasons, substantial evidence supports the trial court's finding that Alford's actions were sufficient to establish the actus reus element of aider and abettor liability.

### B. Determination of mens rea

To be considered an aider and abettor of a specific intent crime such as murder, the person must share the specific intent of the perpetrator. This state of mind or mens rea occurs " 'when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." ' " (*McCoy, supra*, 25 Cal.4th at p. 1118.) Where both the perpetrator's intended offense and the charged offense are murder, the aider and abettor "must know and share the murderous intent of the actual perpetrator" to be liable. (*Ibid*.)

The mental state required to be liable for murder is malice aforethought. (§§ 187, subd. (a); 188, subd. (a)(3).) An aider and abettor of a killing must possess malice aforethought to be guilty of murder. (*People v. Gentile, supra*, 10 Cal.5th at pp. 844-845.)

Malice can be either express or implied. (§ 188, subd. (a).) It is express when there is a manifest intent to kill. (§ 188, subd. (a)(1).) It is implied if someone kills with "no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) The California Supreme Court has clarified the definition of implied malice: "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

13

The trial court found that Alford acted with both express and implied malice. Alford contends the court erred by (1) not adequately considering his voluntary intoxication as a factor precluding a finding of express malice; (2) not determining implied malice under its correct definition; and (3) not considering Alford's youth at the time of the crime and its impact on his ability to form malice for second degree murder.

### 1. Voluntary intoxication

Evidence of voluntary intoxication is admissible when considering whether an aider and abettor had the required specific intent. (§ 29.4; *People v. Mendoza, supra*, 18 Cal.4th at p. 1131.) "Intoxication may explain lack of knowledge that someone else intends to commit a criminal act; the lack of knowledge would excuse the person from liability for that act." (*Mendoza,* at p. 1130.) In the context of second degree murder, voluntary intoxication can negate a finding that the defendant harbored express malice. (*People v. Morales* (2021) 69 Cal.App.5th 978, 997.) It cannot, however, negate a finding of implied malice. (*Ibid*.)

The trial court stated it had considered evidence from the original trial regarding Alford and others "being under the influence at the time of the incident as it may relate to criminal responsibility." The court did not specifically mention Alford's intoxication when discussing the evidence or concluding that Alford harbored both express and implied malice. Alford contends this lack of discussion of his voluntary intoxication and its effect on his mens rea indicates the trial court did not "properly consider this factor."

We disagree. We presume the judgment challenged on appeal is correct, and the appellant bears the burden to affirmatively demonstrate error. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) We also presume the court followed the law in exercising its duties and duly considered the evidence presented to it. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.) "In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that

14

evidence." (*Ibid*.)  It was Alford's duty to establish error, and he has not provided evidence that would suggest the trial court did not properly consider the evidence of his voluntary intoxication when it determined he had acted with express malice.

### 2.    Applying <u>correct</u> <u>definition</u> <u>of</u> <u>implied</u> <u>malice</u>

At the evidentiary hearing, the trial court stated that Alford could be convicted of implied malice second degree murder as an aider and abettor "if [he] knows that his or her conduct endangers the life of another and acts with conscious disregard for the life of another, such as the statements . . .  'Killing pigs.' "  Alford contends the trial court's reliance on whether his conduct endangered the life of another was inadequate to properly evaluate his state of mind in light of the standard of aider and abettor implied malice set forth in *Reyes, supra*, 14 Cal.5th 981, an opinion issued nine days after Alford's evidentiary hearing in 2023.  Alford contends the trial court did not apply the standard of implied malice announced in *Reyes*, and we should remand to allow the court to apply the correct standard.

Discussing the dangerous to life of another element in the implied malice standard as it applies to direct perpetrators, the *Reyes* court, quoting *Knoller, supra*, 41 Cal.4th 139, stated, "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' (*Knoller*, at p. 152; see *ibid.* [under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" '][.])" (*Reyes, supra*, 14 Cal.5th at p. 989.)

Alford contends the *Reyes* court by this discussion clarified that the dangerous to life of another element of implied malice must involve a high degree of probability that the act would result in death.  We disagree with the assertion.  The *Reyes* court did not modify or clarify the standard.  It repeated and relied on the standard it had established in

2007 in *Knoller*. And in that opinion, the high court *equated* " ' "consequences of [the act] are dangerous to life" ' " with " 'high degree of probability that [the act] will result in death.' " (*Knoller, supra*, 41 Cal.4th at p. 152.) The two standards "in essence articulate[] the same standard." (*Ibid*.)

When the *Reyes* court discussed the endangers the life of another element as it applies in aider and abettor implied malice, the court again relied on existing authority to articulate the element. Quoting *People v. Powell* (2021) 63 Cal.App.5th 689, a decision by this court, the high court stated, " 'The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes, supra*, 14 Cal.5th at p. 991, quoting *Powell*, at pp. 712-713.)

Alford offers no evidence or argument that the trial court did not apply the standard of aider and abettor implied malice murder as set forth in *Reyes*, *Knoller*, and *Powell*. The court determined, among other factors, that Alford understood that the consequences of Croy's shooting were dangerous to life, which also meant Alford understood there was a high probability that the shooting would result in death. Remand is thus not required.

### 3. Consideration of Alford's youth

A number of appellate cases have concluded that a defendant's youth is a factor within the totality of circumstances when considering whether the defendant was a major participant in the underlying felony who acted with reckless indifference to human life, the mens rea for felony murder. (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 1001-1003, and cases cited therein.) Based on this authority, at least two appellate courts have determined that trial courts deciding petitions under section 1172.6 must consider a defendant's youth at the time of a murder when determining whether the defendant acted

16

with implied malice. (*Id.* at pp. 1003-1004, 1006; *People v. Pittman* (2023) 96 Cal.App.5th 400, 416-418.)

Alford contends the trial court erred when it did not consider his youth at the evidentiary hearing and its impact on his ability to form the mens rea for committing second degree murder. Assuming only for purposes of argument that the court did not consider Alford's age when it concluded he acted with conscious disregard for human life, any error was harmless because the court also found that Alford acted with express malice, i.e., an intent to kill, for which Alford's youth was not relevant.

In *People v. Pittman, supra*, 96 Cal.App.5th 400, the Court of Appeal explained that "[t]he policy interests underlying the felony-murder cases—that youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability—apply equally in the context of implied malice murder." (*Id.* at p. 417.) That is because "the implied malice mental state—conscious disregard for human life [citation]—is similar to the 'reckless indifference to human life' standard applicable to felony murder. [Citation.] Indeed, the concept of reckless indifference to human life has a subjective component that expressly incorporates the 'conscious[ ] disregard' of ' "the significant risk of death [the defendant's] actions create." ' " (*Ibid.*) In light of these similarities, the Court of Appeal saw "no reason not to apply the principle articulated in the felony-murder cases" to a case of implied malice murder. (*Ibid.*)

But in the case before us, the trial court found Alford guilty, beyond a reasonable doubt, as an aider and abettor of both implied malice murder and express malice murder. Express malice requires solely a specific intent to kill. Alford offers no argument for the relevance of his ability to perceive risk and consequences as a youth when the trier of fact has found he acted with an express intent to kill. Thus, any error by the trial court in not considering Alford's youth was harmless. There is no reasonable likelihood Alford would have obtained a more favorable verdict had the trial court considered his youthfulness. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

17

II

*Admissibility of Prosecutor's Statement in Patrick Croy's Retrial*

Alford contends the trial court abused its discretion by not admitting into evidence transcripts from Patrick Croy's retrial where the prosecutor in that action conceded he could not prove beyond a reasonable doubt that Croy heard Alford's and Thom's yelling. Alford asserts the prosecutor's statement was admissible under an exception to the hearsay rule for statements made by and offered against a party to the action. (Evid. Code, §§ 1220, 1222.) He also argues the People, due to the prosecutor's concession in the Croy retrial, should be judicially estopped from asserting that his words or actions aided and abetted the shooting.

A.     Background

Prior to the evidentiary hearing, the parties stipulated that an exhibit designated as Exhibit H contained authentic and certified portions of the trial transcript from Croy's retrial in *People v. Croy* (Super. Ct. San Francisco City and County, 1990, No. 131832). Croy was retried for murder and was found not guilty. Gary Rossi prosecuted the action on behalf of the State of California and the County of Siskiyou.

Exhibit H contained an excerpt from the reporter's transcript of a police officer's testimony during the Croy retrial and the parties' arguments about it. The transcript reports that Rossi asked a testifying police officer how Alford and Thom were responding to his attempts to speak with them. The officer stated the two were shouting at the officers "and they would turn around and shout up on the hillside basically –" At this point, defense counsel objected "to what was said." The trial court recessed and went into chambers with counsel.

The court asked Rossi if he knew what the witness's answer would be. The dialogue proceeded as follows:

"MR. ROSSI: Well, I think he is going to testify that they were saying kill the pigs, things of this nature, which I would state would be non-assertive utterances at this point and not hearsay.

"THE COURT: Not offered for the truth.

"MR. ROSSI: Right."

Defense counsel argued that Alford's and Thom's statements did not reflect that the suspects on the hill even heard Alford or Thom, let alone responded to them. Counsel contended there was no applicable hearsay exception, and the officer's testimony was not relevant. The dialogue continued:

"THE COURT: How does it come in, Mr. Rossi.

"MR. ROSSI: I think it is non-assertive conduct and thus not hearsay.

"THE COURT: You are saying it is a testimonial act.

"MR. ROSSI: Exactly. [¶] As far as relevancy it goes to explain this officer's conduct as well as the other officer's conduct vis-a-vis this individual and what comes later. Further I would state for the record there is going to be evidence these people were shouting up to the suspects on the hill.

"THE COURT: They may have been shouting up to the suspects but if you are relying on the fact that the suspects heard it. You haven't been able to establish that foundation.

"MR. ROSSI: And I am not going to be able to prove that beyond a reasonable doubt."

Defense counsel then objected under Evidence Code section 352 that the officer's testimony would he highly inflammatory and would be used to explain what the officer did next. The trial court determined the testimony was not hearsay, as it was not offered for the truth of anything. Turning to the section 352 objection, the court asked Rossi to explain the testimony's relevance. Rossi began by stating the testimony's relevance was

19

to explain "the situation at the crime scene that the officers" -- and the transcript ends at that point.

At the evidentiary hearing on Alford's petition for resentencing, Alford argued in an in limine motion that Rossi's statement in Croy's retrial that he was not going to be able to prove beyond a reasonable doubt that the suspects heard Alford's and Thom's yelling was admissible and that the People were bound by Rossi's concession. The trial court denied the motion, stating, "The representation to the court was in a separate trial with different circumstances at the time of the trial, and so the Court declines to admit the requested materials in Exhibit H. That's the Court's ruling."

B.      Analysis

Assuming only for purposes of argument that Rossi's statement was admissible in this action under Evidence Code section 1220 as a statement by a party, we conclude any error by the trial court in not admitting the statement was harmless. We review the erroneous exclusion of evidence under the harmless error standard of *People v. Watson, supra*, 46 Cal.2d at p. 836. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131.)

It is not reasonably likely the trial court would have reached a different outcome had it admitted Rossi's statement from Croy's 1990 retrial. That Rossi could not establish that Croy heard Alford's yelling did not preclude this trial court from finding sufficient evidence in the record before it to establish that Alford aided and abetted Croy.

Officer Callahan testified that after he tried to talk to the suspects on the hill using his vehicle's PA system, he heard Jones respond to him from the hill. The two men actually conversed with each other for a time, with Jones yelling his responses. At times, Callahan had trouble hearing Jones because of Alford's and Thom's yelling and screaming. But Callahan continued to hear Jones asking after Hittson had been shot where Hooty was and whether the officers had killed Hooty.

20

From this evidence, the trial court reasonably concluded that communication was successfully being made to and from the hill, and if Officer Callahan could hear Jones yelling from the hill, the suspects on the hill could hear Alford and Thom yelling towards them. The court stated, "The Court also notes that the testimony that the officers at the bottom of the hill -- the testimony establishes that officers were able to hear conversations between officers and suspects who were on the hill.

"Officers were able to hear conversations between suspects in position on the hill, such as conversations, as I mentioned, between Jones and Croy, and the Court finds that this information leads to a persuasive inference that the suspects on the hill were able to hear the comments of officers. Additionally, this inference leads to the -- or the inference establishes that comments such as, 'Kill the pigs. Kill us. You got one of the pigs, get another.' And all of the noise and commotion created by Alford and Thom near the officers at the bottom of the hill could be heard by the suspects on the hill, and the extent to which those conversations, comments, interaction with officers prolonged the duration of the confrontation that led to the death of Bo Hittson.

"The Court also finds that the inference of those on the hill, or the shooter, is also supported by information that the shooting became more intense as statements by those down the hill, such as Petitioner, were made." That Rossi was unable to establish that Croy heard Alford's yelling in Croy's retrial did not preclude the trial court here from determining on the evidence before it that Croy heard the yelling.

Moreover, there is no requirement that for an aider and abettor to be liable, the perpetrator must know or be aware of the aider's actions to aid the commission of the crime. Even if the suspects on the hill did not hear Alford's and Thom's yelling, Alford is still liable for aiding and abetting if Croy killed Officer Hittson, Alford knew of Croy's intent and intended to assist Croy in achieving that end, and he acted in a manner that in fact assisted the achievement of the act. (*People v. Perez, supra*, 35 Cal.4th at p. 1225.) As we stated above, the record reflects that Alford's actions in fact assisted in the crime

21

by interfering with the police officers' ability to establish communication with the shooter and suspects on the hill and defuse the situation. That was sufficient to establish aider and abettor liability.

Because substantial evidence establishes that Alford aided and abetted at minimum by disrupting the police officer's attempts to establish communication with the suspects on the hill, any error by the trial court in not admitting Rossi's statement in Croy's retrial that he was unable to establish Croy heard Alford's statements was harmless.

Additionally, because the evidence establishes that Alford aided and abetted the killing by interfering with law enforcement's attempts to communicate with the suspects on the hill, we need not address his argument that the People should be judicially estopped from asserting that Croy could hear and was influenced by Alford's words.

DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

KRAUSE, J.

_____

MESIWALA, J.